George S. BROWN, Jr., Plaintiff–Appellant,

v.

CHASE BRASS & COPPER CO., INC., Defendant–Appellee.

No. 00–3308.

United States Court of Appeals, Sixth Circuit.

July 10, 2001.

Before RALPH B. GUY, JR., BOGGS, and GILMAN, Circuit Judges.

PER CURIAM.

George Brown sued his former employer, Chase Brass & Copper Co., alleging age discrimination, disability discrimination, and retaliation in the company's handling of his deteriorating medical condition that eventually left him unable to work. Chase denied those charges and sought summary judgment, which the district court granted because Brown could not

perform the essential functions of the jobs he wanted, did not ask for an ADA accommodation, and—assuming his longstanding advocacy of a rotation system became a request for an accommodation—the accommodation he wanted was unreasonable as a matter of law. We affirm the district court's holdings on each of these points. We affirm the judgment for Chase on the retaliation claim on grounds not relied on by the district court but patently evident in the record.

I

Chase Brass & Copper Co., Inc. ("Chase" or "the company") manufactures brass rods. The company's production and maintenance employees are represented by the United Steelworkers of America, with the terms and conditions of their employment governed by a collective bargaining agreement. George S. Brown, Jr., worked for Chase as a Finish Helper from 1971 until March 30, 1998, at which time he was 72 years old. Finish Helpers are assigned to specific jobs that fall within that category of employment: finish saw helper, straightener helper, pipe saw helper, buckman helper, strapping helper and finish machine helper (5–line, 6–line, and 8–line).[1] In 1983, Brown transferred from the overnight second shift to the daytime first shift at Chase's Williams County, Ohio, plant. Soon thereafter, he asked the company to establish a rotation system for Finish Helpers on the first shift, whereby all Finish Helpers would rotate through the eight jobs within that classification. Chase used such a system on its second shift but it declined to rotate workers on its first shift; the record does not disclose the reasons for Chase's business decision. For the next fifteen years, Brown pleaded with Chase to follow his recommendation.

Chase never adopted the change, and first-shift Finish Helpers still do not change tasks on a rotating basis.

On February 17, 1997, Brown's seventy-first birthday, he asked General Foreman Chuck Haynes to transfer him off the finish saw. Haynes advised that any transfer would not happen right away, as none of the job assignments for Finish Helpers on the first shift were vacant at that time. A few days later, Brown revisited his request, explaining to Haynes: "I talked it over with my wife and ... I may retire and you won't have to worry about that." As Brown explains it, he withdrew his transfer request because he had heard he might be assigned to the 6–line position, which he did not want, since his age and the carpal tunnel syndrome afflicting his hands would make that assignment particularly difficult, if not impossible, to perform. Additionally, he did not want to displace other workers from their assigned duties.

On March 4, 1997, Brown presented a doctor's statement certifying that he was "totally incapacitated" and would be unable to return to work for approximately six weeks following surgery to treat carpal tunnel syndrome in both hands. On March 7, 1997, during his leave of absence, Brown filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"), alleging age discrimination in Chase's refusal to rotate the Finish Helpers or assign him to a Finish Helper job then held by a younger worker.

The company held Brown's job open for him during his surgery-related leave of absence. On June 20, 1997, Brown returned to the finish saw and worked there

---

1. The collective bargaining agreement creates a procedure by which employees can bid on vacancies in job classifications other than their own. Brown never sought to "bid off" the Finish Helper classification.

continuously until March 30, 1998, when his doctor again certified his total incapacity due to carpal tunnel syndrome. He took another leave of absence, during which his doctor ordered a functional capacity evaluation to determine his ability to perform work. The evaluation report, dated April 21, 1998, concluded that Brown "does not have the physical capacity to return to a continuous and repetitive or constant job function requiring grasp, place and release using the fingers, thumb, and wrist." His doctor allowed him to return to work on June 2, 1998, "within limits of functional capacity evaluation—permanent restrictions." Upon his return, Brown was advised that only his old finish saw position was available, which he declined to accept in light of the restrictions imposed by his doctor. Instead, Brown sought a transfer to the buckman Finish Helper position (then held by Richard Kreischer), which he considered a "light duty" job. Foreman Haynes explained that the company did not have any "light duty" positions available and refused to eject Kreischer from a position he had held for more than 15 years. Brown's employment at Chase thus ended in June 1998.

On October 29, 1998, Brown filed a second charge of discrimination with the OCRC, claiming disability discrimination (insofar as Chase employed non-disabled workers in the buckman, 5–line, and 8–line positions despite Brown's request to assume those jobs) and retaliation for participation in a protected activity, presumably the filing of his earlier charge of age discrimination.

Brown admits that the three jobs he wanted were not vacant in 1998; indeed, they had been held by the same three men since before Brown joined the first shift in 1983. In his deposition testimony, Brown described the functions of the buckman, 5–line, and 8–line Finish Helper positions, which included a variety of strenuous manual tasks, all of which required grasping or similar handling of tools and materials. He admitted he could not perform these functions as of June 1998, given the restrictions imposed by his doctor. In a later-filed affidavit, he maintained that he was physically able to perform the buckman, 5–line, and 8–line jobs "in 1993 and 1994," before "the physical conditions affecting his wrists became progressively worse." Foreman Haynes filed an affidavit explaining that the company refused to place Brown in the buckman, 5–line, and 8–line jobs in June 1998 because other workers held those jobs and Brown could not have performed their essential tasks in compliance with his doctor's restrictions.

Chase sought summary judgment. Although the briefing proceeded in an unorthodox manner, the district court resolved all three of Brown's claims.

The court held that Brown had not made out a prima facie case on his age discrimination claim because he admitted that he could not perform the essential functions of his finish saw Finish Helper position, *i.e.* he was unqualified for the position, and the ADEA does not require employers to accommodate an aging employee. The court additionally observed that Brown could not perform the essential functions of any Finish Helper position and that no such positions were vacant at the time he sought to change jobs.

On the ADA claim, the parties agreed that Brown could not perform the essential functions of the finish saw job he held before going on disability leave, nor could he perform the essential functions of the pipe saw, strapping, or six-line Finish Helper jobs. Brown argued that he *might* be able to perform the essential functions of the buckman, 5–line, and 8–line positions with some help from co-workers, if given the chance. The court found that Brown never specifically asked Chase to

establish a rotation system *as an accommodation for his disability* but nevertheless held that, assuming Brown had requested such an accommodation, it was unreasonable as a matter of law because it would "reallocate job duties in a way that changes the essential functions of" not only the finish saw position but three other jobs already held by other employees. Addressing an alternative theory of discrimination, the court held that Chase's failure to assign Brown to the buckman, 5–line, or 8–line Finish Helper positions upon his return from disability leave did not constitute discrimination because none of those positions was vacant and the ADA does not require employers to "bump" one employee in order to accommodate another. Additionally, the court noted that "there appears to be no factual dispute" that Brown could not perform some of the essential functions of the buckman, 5–line, and 8–line positions, which fact he effectively conceded in his deposition.

Resolving the retaliation claim, the district court misapprehended the facts, stating that Brown last worked at Chase on March 30, 1998, was last denied an accommodation when he sought to return to work in June 1998, and filed his age discrimination charge on October 29, 1998. The court held that the retaliation claim failed because Brown could not point to any adverse employment action taken *after* he filed his charge. As Chase admits on appeal, Brown actually filed his age discrimination charge with the EEOC and OCRC on March 7, 1997, during his first leave of absence. He filed his ADA and retaliation claims on October 29, 1998.

The court entered summary judgment in favor of Chase on all claims. Brown timely appealed. His brief on appeal does not address his age discrimination claim, and we accordingly hold that he has abandoned it.

## II

*McDonnell Douglas* and its progeny established a burden-shifting regime for analyzing employment discrimination cases, allocating the burdens of production and persuasion. *See Roh v. Lakeshore Estates, Inc.*, 241 F.3d 491, 497 (6th Cir.2001). First, the plaintiff must establish a prima facie case of discrimination. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "A person seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of [his] disability." *Gilday v. Mecosta County*, 124 F.3d 760, 761 (6th Cir.1997). Upon such proof a trier of fact presumes discrimination, and "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089. "By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, [defendants] sustain[ ] their burden of production." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original). "When the defendant articulates a legitimate non-discriminatory reason for undertaking an adverse employment action, the plaintiff must introduce evidence that the proffered reason is a pretext for discrimination." *Roh*, 241 F.3d at 498.

The parties agree that Brown made out the first element of his prima facie case: he is an individual with a disability within the meaning of the ADA. The central issue in this case, then, is whether Brown satisfied the second element. The parties agree that, without an accommoda-

tion, he could not perform the essential functions of his job as a finish saw Finish Helper. Brown claims that he sought and Chase denied his request for what he considers a reasonable accommodation when he asked Chase to establish a rotation system whereby he could (at least in 1993 or 1994, and perhaps later with some help from co-workers) perform the duties of the buckman, 5–line, and 8–line Finish Helpers on a rotating basis.

■ The "disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir.1996). The employer, however, bears the burden of persuasion on whether a proposed accommodation would impose an undue hardship. *See ibid.* Brown argues that the district court erred in finding that he never requested establishment of a rotation system *as an accommodation of his disability* because the record showed that Chase was "aware of Plaintiff's disabilities and of the nature of the requested accommodation." Pl. Br. at 21. In support of this claim, he points to his repeated calls (dating back to 1983) for a rotation system like that used on the second shift and his OCRC *age discrimination* charge, in which he asserted that foreman Haynes "refused to rotate the employees as was done in the past."

■ None of this evidence demonstrates that any of his requests were meant as or treated as a request for an ADA accommodation. Moreover, Brown rescinded his February 1997 request because he did not want to "disrupt the other guys," and nothing in the record indicates that he repeated his rotation request when he spoke to Haynes in June 1998. At that time he made only vague references to "light duty" job assignments and focused on getting Haynes to reassign Richard Kreischer in order to create a vacancy in the buckman job. The district court correctly held that Brown failed to create a genuine issue of material fact as to whether his longstanding recommendation that Chase establish a rotation system ever became a request for an ADA accommodation.[2] Since he failed to propose an accommodation of his disability, he cannot satisfy the second element of his prima facie case (being qualified to perform the essential functions of his job with a reasonable accommodation), so his ADA claim fails.

■ Brown also takes issue with the district court's second valid reason for granting summary judgment: establishing a rotation system of the sort Brown advocated was unreasonable. Brown claims that the duties of the four positions he identified, all of which were within the Finish Helper classification, could have been adjusted in order to accommodate his disability. Brown is no doubt correct;

2. For the first time on appeal, Brown argues that Chase did not satisfy its obligation to initiate an informal, interactive process with a qualified individual who requested an accommodation in order to craft a reasonable one. *See* 29 C.F.R. § 1630(*o* )(3). If an employer's unwillingness to engage in such a process leads to a failure to reasonably accommodate an employee, the employer might be liable under the ADA. *See Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). In a case involving a paranoid schizophrenic and bipolar employee, the Seventh Circuit stated that "[t]he employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Comm. Schs.*, 100 F.3d 1281, 1285 (7th Cir.1996). Brown's disability quite clearly does not impede his ability to request an accommodation, so he must request it in the first instance. Chase's duty to engage in an interactive search for a reasonable accommodation, therefore, never arose.

Chase *could* have reassigned tasks. But the success of an ADA discrimination claim requires Chase to have had a legal obligation to reassign tasks to provide plaintiff a *reasonable* accommodation.[3] Critically for present purposes, "the ADA does not require an employer to reassign an employee to a position that is not vacant." *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir.1997). None of the positions that Brown wanted to rotate through were open at the time he supposedly sought an accommodation. Brown proposed creating an entirely new (on the first shift) rotation system that redistributed the tasks of as many as four Finish Helpers, presumably assigning new essential functions to each of the other three for approximately 75% of their working time. The ADA does not require an employer to create a new position to accommodate a disabled worker or to reallocate job duties in a manner that changes the essential functions of a job. *See Bratten v. SSI Svcs., Inc.*, 185 F.3d 625, 632 (6th Cir.1999).[4] And, as the district court held, an employer has no obligation to create a permanent light duty post when none previously existed. *See Martin v. Kansas*, 190 F.3d 1120, 1133 (10th Cir.1999). Although Brown's proposal would not have reassigned any employees out of the broad Finish Helper classification, it would have significantly redistributed tasks among workers who held different jobs within that classification, a point Brown concedes.[5] Thus, the accommodation he supposedly requested was unreasonable as a matter of law. For this reason as well, he could not make out the second element of his prima facie case.

◼ In order to demonstrate that Chase did not adequately support its claim that Brown's proposal would redistribute *essential* job duties, *see Bratten*, 185 F.3d at 632 (noting that employers may be required to reassign non-essential tasks in order to accommodate an employee's disability), Brown challenges the district court's assessment of the essential functions of the buckman, 5–line, 8–line, and finish saw po-

3. "The term 'reasonable accommodation' may include—(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9); *see also* 29 C.F.R. § 1630.2(*o* )(1).

4. *Bratten* explained that "the ADA requires 'job restructuring' as a 'reasonable accommodation' in appropriate circumstances. However, ... 'job restructuring' within the meaning of the ADA only pertains to the restructuring of non-essential duties or marginal functions of a job. ... [E]mployers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by vir-

tue of his disability." *Bratten*, 185 F.3d at 632 (citations omitted).

5. The collective bargaining agreement considers Finish Helper a generic classification subject to the bidding process, containing eight sub-classifications. If an employee successfully bid for the broad classification. Chase would assign him to a specific job within that category. Brown's position at oral argument, that the ADA requires reshuffling of workers within the Finish Helper classification because doing so would not violate any workers' rights under the collective bargaining agreement, is not correct. *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir.1998) (a reasonable accommodation by means of "reassignment will not require *creating a new job, moving another employee*, promoting the disabled employee, *or* violating another employee's rights under a collective bargaining agreement" (emphasis added)); *see also* 29 C.F.R. § 1630.2(*o* )(2)(ii) ("Reasonable accommodation may include ... reassignment to a *vacant* position ...." (emphasis added)).

sitions. He argues that the district court should have engaged in "a more detailed analysis" and "required a more detailed showing" by Chase.

As this court has recognized,

> 29 C.F.R. § 1630.2(n)(3) enumerates seven non-exclusive factors to weigh in determining if a function is "essential," to wit: (1) an employer's judgment that the function is essential; (2) written job descriptions; (3) the amount of time on the job devoted to performing the function; (4) the consequences of not requiring the employee to perform the function; (5) terms in a relevant labor agreement; (6) the work experience of those who have held the position in the past; and (7) the current work experience of those who hold similar jobs.

*Brickers v. Cleveland Bd. of Educ.,* 145 F.3d 846, 849 (1998). "The inquiry into whether a function is essential is highly fact specific." *Hoskins v. Oakland Co. Sheriff's Dep't,* 227 F.3d 719, 726 (6th Cir. 2000) (citing *Brickers* ). "Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. United States Postal Serv.,* 857 F.2d 1073, 1079 (6th Cir.1988). Still, nothing prevents a court from resolving a summary judgment motion on the basis of such a fact-specific determination when the evidence before the court pertinent to essentiality does not conflict, insofar as the non-moving party has failed to create a genuine issue of material fact.

Brown effectively challenges the quality of the evidence Chase presented, which included an affidavit by Foreman Haynes and Brown's own testimonial descriptions of the various job functions given at his deposition but did not include written job descriptions and did not specify the amount of time each Finish Helper devoted to performing the various functions.

Yet Brown has not identified any evidence even suggesting that the district court reached the wrong conclusion. He failed to create a genuine issue of material fact as to whether certain functions he could not perform were essential, and the district court did not err in accepting the affidavit of Foreman Haynes and *Brown's own testimony* on this point.

Finally, a third separate reason supporting summary judgment in favor of Chase is that Brown leaves unchallenged the district court's determination—also based on Brown's testimony at his deposition, and reached in the absence of contrary evidence—that Brown could not have performed the essential functions of the jobs he sought even with an accommodation. Because he could not perform the essential functions of the jobs he sought, he was not qualified for them. This is yet another fact fatal to Brown's attempt to prove the second element of his prima facie case.

### III

To establish a prima facie case of retaliation, a plaintiff must produce evidence showing: "(1) that he engaged in an activity protected by [the civil rights laws]; (2) that this exercise of his protected civil rights was known to defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *See Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990) (citing *Wrenn v. Gould,* 808 F.2d 493 (6th Cir.1987); *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793 (9th Cir.1982)). "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Cohen,* 686 F.2d at 797. A Tenth Circuit case cited with approval by this

court, *see Wrenn,* 808 F.2d at 501, explains that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Telephone Co.,* 683 F.2d 339, 343 (10th Cir.1982) (citing *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980); *Womack v. Munson,* 619 F.2d 1292, 1296 & n. 6 (8th Cir.1980)). However, the mere fact that an adverse employment action occurs subsequent to the protected activity does not, standing alone, support an inference of retaliation. *See Cooper v. City of North Olmstead,* 795 F.2d 1265, 1272 (6th Cir. 1986). As in discrimination cases, once a plaintiff makes out a prima facie case, the employer must articulate a legitimate non-retaliatory reason for the adverse action, which articulation will shift the burden back onto the plaintiff to show that the articulated reason is merely pretext for retaliation. *See Thatcher v. Goodwill Indus., Inc.,* 117 Ohio App.3d 525, 690 N.E.2d 1320, 1327 (Ohio Ct.App.1997).

█ As described above, Chase concedes error in the district court's reasoning granting summary judgment on Brown's retaliation claim. Brown engaged in protected activity by filing an age discrimination charge with the OCRC on March 7, 1997, and was last denied an accommodation (assuming he framed his requests as such) when he tried to return to work in June 1998, having taken his last leave of absence on March 30, 1998. Thus, Brown suffered an adverse employment action after he engaged in protected activity.

Chase submits a variety of alternative grounds to support summary judgment in its favor, foremost of which is Brown's lack of qualification for the jobs he sought. Chase claims that it refused to establish the rotation system or assign Brown to jobs then held by other workers because, by his own admission, Brown could not perform the essential functions of his former position as a finish saw Finish Helper or any of the Finish Helper jobs he wanted to rotate into. In a retaliation case, which typically involves not a refusal to hire but demotion or termination, lack of qualification for a job seems best asserted as a legitimate non-discriminatory reason, since qualification is not explicitly included in the elements of the prima facie case.

We nevertheless affirm summary judgment for Chase because Brown proffered no evidence of a causal link between his March 1997 charge of age discrimination and the company's actions in June 1998, which occurred after it permitted him to return to work on June 20, 1997. An adverse action occurring fourteen months after engagement in a protected activity will not, by itself, give rise to an inference of retaliation. *Compare Cooper,* 795 F.2d at 1272 ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference of retaliation."), *and Brown v. ASD Computing Ctr.,* 519 F.Supp. 1096, 1116 (S.D.Ohio 1981), *aff'd sub nom. Brown v. Mark,* 709 F.2d 1499 (6th Cir.1983) (three-month separation between protected activity and termination did not raise the inference necessary to support a prima facie case of retaliation), *with Womack,* 619 F.2d at 1297 (suspension within five days and discharge within 20 days of protected activity supports an inference of retaliation), *Jefferies v. Harris County Cmty. Action Ass'n,* 615 F.2d 1025, 1035 (5th Cir.1980) (discharge within two days of protected activity supports inference of retaliation), *and Thatcher,* 690 N.E.2d at 1327 (termination three weeks after protected activity raised inference of causal connection). Because Brown failed to present evidence that would support a finding in his favor on the fourth element of his prima facie case of retaliation, judg-

ment as a matter of law was appropriate. We may affirm on any grounds supported by the record even if different from the reasons of the district court, *see Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir.2000) (citing *Andrews v. Ohio*, 104 F.3d 803, 808 (6th Cir.1997)), and here we do so.

## IV

Brown failed to make out the second element of his prima facie case of disability discrimination and the fourth element of his prima facie case of unlawful retaliation. Accordingly, we AFFIRM the judgment of the district court.