*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0049P (6th Cir.)
File Name: 01a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DIANE ROH,
        *Plaintiff-Appellee,*

        *v.*                                    No. 99-6172

LAKESHORE ESTATES, INC.,
        *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 96-00977—Todd J. Campbell, District Judge.

Argued: September 21, 2000

Decided and Filed: February 26, 2001

Before: BOGGS, SUHRHEINRICH, and GIBSON, Circuit
Judges.*

———————————

**COUNSEL**

**ARGUED:** H. Rowan Leathers III, MANIER & HEROD,
Nashville, Tennessee, for Appellant. Todd E. Panther,
TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for

---

*The Honorable John R. Gibson, Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

1

Appellee.  **ON BRIEF:**  H. Rowan Leathers III, Christopher W. Cardwell, Gregory H. Oakley, MANIER & HEROD, Nashville, Tennessee, for Appellant.   Todd E. Panther, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellee.

BOGGS, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined.   GIBSON, J. (pp. 16-18), delivered a separate dissenting opinion.

––––––––––––––––

**OPINION**

––––––––––––––––

BOGGS, Circuit Judge.   The trial of this Title VII and Tennessee Human Rights Act religious discrimination case ended in a jury verdict for the plaintiff.  The appellant here argues that (1) the district court should have granted its post-trial motion for judgment as a matter of law because the plaintiff failed to make out a prima facie case in that she was not qualified for the position she sought, and (2) the district court erred in excluding, on unfair surprise grounds, a defense witness who could have impeached the plaintiff.  We reverse because no rational trier of fact could have concluded that the plaintiff was qualified for the position she sought.  Thus, her religious discrimination claim fails as a matter of law.

## I. FACTUAL BACKGROUND

Diane Oakley Roh earned an associate's degree in nursing from Nashville's Belmont University in 1984.  She became a registered nurse and held a variety of nursing positions over the next six years.  By December 1990, she had obtained a position in the nursing department of Lakeshore Meadows, a 131-bed nursing home owned and operated, along with two sister homes, by the defendant, Church-of-Christ-affiliated Lakeshore Estates, Inc.  She became charge nurse for a hall housing 30-35 patients and quickly progressed from the afternoon-evening shift to the day shift, which carries more responsibility.  Six months later, the acting administrator of

"discriminatory policy with regard to administrators" during Roh's employment and that all administrators who were employees of Lakeshore were members of the Church of Christ. After Pope had been admitted to the AIT program, Roh had another of several conversations with Sullivan about her desire to become an administrator. Sullivan agreed that it was a strike against her that she was not a member of the Church.

There is sufficient evidence to support the jury's finding that Roh was qualified under the Tennessee Board rules to enter the AIT program. I would affirm the judgment.

the Meadows facility promoted Roh to Director of Nursing, which put her in charge of the entire nursing operation.

As Director of Nursing, Roh's responsibilities touched on almost every aspect of the facility. She ensured compliance with a variety of state regulations concerning patient care. She oversaw the medical records operation, supervising a clerk who maintained them. Roh monitored pharmacological treatments, took care that the pharmacy department's instructions were followed, and responded to the pharmacy department's periodic audits of medication use. She routinely dealt with dietary matters and worked with the dietary manager to keep patients well nourished. She responded to patient infections by working with doctors and overseeing her staff's ongoing treatment of infectious patients. Her social work functions involved dealing with families' concerns about their relative's treatment and the patients' own concerns. Until mid-1995, when Meadows hired a licensed social worker, Roh shared social work duties with the woman directly responsible for social work, the director of the social work department. She occasionally worked in admitting, determining whether the facility could care for a prospective patient.

Her nursing department was the biggest department in the facility, had the largest budget, and directly handled the largest part of the home's day-to-day operations. Roh supervised as many as 40 employees, including hiring, evaluating, reprimanding, and terminating them. Evaluations of her own work consistently contained excellent remarks, and she received a series of raises and bonuses until just three months before her termination. Under Roh's view of the facts, when the facility's administrator was not there, Roh was "in charge." Pl. Br. at 7. Yet the record does not indicate the frequency and duration of the administrator's absence or the nature and extent of her responsibilities— she testified only that she was "next in line" and that "if there was a problem, I was usually the one called."

Throughout her employment at Lakeshore, Roh considered herself Presbyterian but did not actively practice a faith. From 1992 through her June 17, 1996, termination, she worked closely with William Sullivan, vice-president of Lakeshore, administrator of the Meadows facility, and Roh's immediate supervisor. Sullivan and Roh attended grade school together for a year at David Lipscomb, a Church-of-Christ-affiliated institution with a grade school, secondary school, and university in Nashville. Before high school, Roh left Lipscomb and stopped attending the Church of Christ— a point of occasional conversation and joking between Roh and Sullivan. According to Roh, Anita Callahan, her assistant director of nursing, also knew that Roh was not a member of the Church of Christ. Lakeshore claimed it did not know Roh's religious preference.

Roh first discussed her interest in entering an Administrator In Training ("AIT") program with Lakeshore in 1995, speaking to administrator Sullivan, assistant director of nursing Callahan, and a consultant working at the facility. She expressed her desire to obtain an administrator's license so that she could grow with the company, having already accomplished a lot in the nursing department. Sullivan did not meaningfully respond and said nothing about Roh being unqualified to enter an AIT program. Roh reiterated her interest in a letter to Sullivan on August 14, 1995, but this also garnered no reaction. Then two others, Les Risner and John Pope, entered an AIT program with Lakeshore. Roh expressed her interest anew, speaking to Sullivan in his office and saying that she thought she had two strikes against her: being a woman and not being a member of the Church of Christ. According to Roh, Sullivan said that only her religious affiliation was a strike against her. While Sullivan recalls discussing the AIT program with Roh only in passing, both agree that he did not mention Lakeshore's policy of accepting only Church of Christ members into an AIT program. At trial, Lakeshore president Donald Whitfield confirmed that, at the time Roh sought entry into an AIT program, Lakeshore had an unwritten policy that all

that patients received proper nutrition and diets. In the area of continuing education, she coordinated the CNT classes for nurses and technicians. She was responsible for being on top of state regulations concerning patient care and record-keeping so that the facility would fare well in the regulators' annual unannounced inspection tours. She functioned as a social worker in the absence of a social work department at the facility, with family members coming to her to discuss various patient issues. As the person "next in line" after William Sullivan, Roh was called upon if problems arose when he was gone.

John Pope became an administrator after completing the AIT program at Lakeshore. Although he had obtained a bachelor's degree and thus was not required by Board rules to demonstrate that he had two years of acceptable management experience, he could not have become an administrator without completing the AIT program.

Pope's employment history included operating shoe stores for twenty-five years followed by working at an independent living apartment complex. After being fired from that position, he sold shoes until he was hired by Lakeshore. He joined Lakeshore as housekeeping director at the Meadows, where he was responsible for the employees who cleaned the residents' rooms, the public areas and the grounds. The budget for his department was significantly smaller than the nursing department's budget. He had no responsibility over nursing functions, medical records, medical supplies, social work, dietary or admissions. Within a year of his employment Pope received a commitment from Donald Whitfield, president of Lakeshore, that he could enter the AIT program if he performed well. Pope was admitted to the program while he held the housekeeping position. Unlike Roh, Pope was a member of the Church of Christ.

Whitfield, testified that the company had required applicants to the AIT program to be members of the Church of Christ. Shortly after Roh filed this lawsuit, that policy changed. Sullivan admitted that Lakeshore had a

—————————

## DISSENT

—————————

JOHN R. GIBSON, Circuit Judge, dissenting.    I respectfully dissent.  I disagree with the essence of the court's opinion today that Roh did not meet the statutory requirements for consideration as an administrator.  The record contains sufficient evidence for the jury to find that she was qualified to enter the training program and be considered for the promotion.

Lakeshore's witness, Winfrey Link, offered nothing more than his personal opinion about whether Roh was qualified.  He was not permitted to speak for the Tennessee Board (of which he was not a member) or to offer any opinion as to how members of the Board would view her qualifications.  He acknowledged that the Board could find that Roh had sufficient acceptable management experience notwithstanding his opinion.

Roh described her management experience in detail.  At the Meadows, she was director of nursing, which was far and away the largest department with the biggest budget at the facility.  In addition to managing that department, she was involved in many other areas.  She supervised the one employee who was responsible for medical records.  She responded to a monthly audit by the pharmacy, and she was responsible for all medications being dispensed and managed in compliance with state regulations.  She was one of four people to attend quarterly pharmacy safety and infection control meetings, and she taught staff how to handle all aspects of infection control.  She was also in charge of medical supplies.

In the area of admissions, Roh was responsible for assessing the facility's ability to care for prospective residents, making arrangements for special equipment, and creating a care plan for all new patients.  It was her responsibility to see

administrators be members of the Church of Christ and, further, that only members be admitted to its AIT program.

Sometime after Roh's in-person request to enter an AIT program, Sullivan strongly urged her to apply for a new admissions coordinator job being created by Mariner Rehab, a company unaffiliated with Lakeshore that had a contract to provide admitting services to three Lakeshore facilities.  When Mariner offered her the position, Sullivan provided a description of her duties in the new job and assured her that it represented an advancement.  After funding problems for the admissions coordinator position arose, Mariner withdrew its offer, but Sullivan assured Roh that he and Mariner were working to resolve the situation.  Sullivan then asked Roh to become an interim director of nursing at Lakeshore's Wedgewood facility while she trained to become an admissions coordinator.  She accepted, but the admissions coordinator position never materialized.  Lakeshore then denied her request to return as permanent nursing director at Meadows and her request to enter an AIT program.  As interim nursing director at Wedgewood, Roh remained on Lakeshore's payroll, but Sullivan made clear that she should accept some sort of job with Mariner or face termination.  Roh refused, again stating her desire to return to Meadows and enter an AIT program, so Lakeshore terminated her.

Lakeshore maintains that it never seriously considered inviting Roh to participate in an AIT program and never denied her that opportunity, because she lacked the minimum qualifications established by Tennessee law to enter an AIT program.  At trial, Roh recited her willingness and ability to submit the necessary documentation to the state with her application for permission to enter an AIT program.  Under Tennessee law, completion of an AIT program is a prerequisite to a candidate with Roh's education sitting for the administrator's examination and becoming a nursing home administrator— a manager who oversees an entire facility's operations.

## II.  TENNESSEE REGULATION OF NURSING HOME ADMINISTRATORS

The Tennessee General Assembly created a state board of examiners for nursing home administrators and conferred on it power to "[d]evelop, impose and enforce standards which must be met by individuals in order to receive a license as a nursing home administrator, which standards are designed to ensure that nursing home administrators are individuals who are of good character and otherwise suitable, and who, by training or experience in the field of institutional administration, are qualified to serve as nursing home administrators."  Tenn. Code Ann. §§ 63-16-102, 63-16-103.

The Tennessee State Board of Examiners for Nursing Home Administrators (the "Board") promulgated Rules regulating licensure of nursing home administrators.  Rule 1020— 1— .05 describes the licensure process.  This Rule requires applicants to receive approval from the Board to take the licensure examination and, depending on the applicant's formal education, may require the applicant to participate in an AIT program in order to satisfy educational prerequisites for the examination.  Rule 1020— 1— .05(1)(j)(3) specifies that applicants holding an associate's degree and having "two (2) years of acceptable management experience" must complete a Board-approved AIT program to satisfy the education prerequisite to sitting for the examination.[1]  Under Rule 1020— 1— .05(1)(k), applicants who complete an AIT program in order to qualify educationally for licensure must

---

[1]By way of comparison, a candidate with a bachelor's degree can enter an AIT program and become an administrator without having had any prior "acceptable management experience."  *See* Rule 1020— 1— .05(j)(2).  As Judge Gibson's discussion of John Pope reveals, *see infra* p. 16, the Board's rule may not make a tremendous amount of business sense.  Nevertheless, I fail to see the relevance of Mr. Pope's entering an AIT program with Lakeshore, for no one has suggested that the Board's Rules unlawfully discriminate on the basis of religion and it appears that Lakeshore faithfully applied those Rules to admit Pope and exclude Roh from its AIT program based on the education requirement contained in the those Rules.

district court's exclusion of Lakeshore's impeachment witness on grounds of unfair surprise.

## V. CONCLUSION

For the foregoing reasons, we conclude that the evidence did not support the jury's verdict.  We **REVERSE** the judgment of the district court denying Lakeshore's motions for judgment as a matter of law, and **REMAND** for entry of judgment in favor of Lakeshore.

acceptable management experience must be acquired in departments other than the candidate's primary field. A maximum of six months' experience out of the total twenty-four can be gained during the AIT program itself. Even if we assume—without any evidence on the question— that the AIT program to which Roh sought admittance would have given her six full months of experience managing the five non-nursing departments, the Rules required her to have eight months of management experience in the five non-nursing departments. Thus, she would necessarily have been required to demonstrate at least two months of supervisory experience outside nursing before she entered the program.

Roh admits that she did not have such experience, and nothing in the record supports a finding that she did. She did not serve as an assistant administrator and conceded that she had no experience managing people who worked in any department other than nursing. Roh's assertions in her brief and at oral argument that she was "in charge" during unspecified periods of the administrator's absence are not born out by the record, as her testimony recounts no more than being the person others usually called when the administrator could not respond. For its part, Lakeshore interpreted this testimony at oral argument to portray Roh as an answering service or some sort of on-call handyman. We need not accept either party's argument, as the testimony in question would not, as a matter of law, permit a rational trier of fact to conclude that Roh had two months of "acceptable management experience." Nor could a rational trier of fact rely on the former Board member's recognition that his assessment of Roh's qualifications could be out-voted, because other members of the Board could, as a matter of raw power, vote to permit anyone to enter an AIT program, regardless of qualifications.

Because Roh's evidence did not carry her burden of proving her qualified for the position she sought, Lakeshore could not, as a matter of law, have discriminated against her in denying her admission to an AIT program. Lakeshore having prevailed on the merits of its appeal, we need not address the

submit an examination application along with various other documentation and obtain Board approval of their candidacy prior to beginning the program.

Rule 1020— 1— .01(1) defines acceptable management experience:

> The actual practice of health care facility administration in an inpatient health care facility with guidance and sharing of responsibility from the administrator and not related to the role of an administrative clerk. "Acceptable management experience" contemplates experience in all departments or areas of the facility, provided, however, that this term is not to be construed to require that the applicant have spent the entire number of years of "acceptable management experience" referred to in Rule 1020— 1— .05(j)(3), (4) and (5) in the capacity of assistant administrator. Responsible supervisory experience in various departments within the facility may be applied to meet the requirements of Rule 1020— 1— .05(j)(3), (4) and (5), and the time spent in a board approved AIT program may also be counted toward these requirements [up to a maximum of 6 months, under Rule 1020— 1— .05(1)(k)(2)]. However, no more than two-thirds (2/3) of the required "acceptable management experience" can be obtained in any one area of the facility, e.g., dietary, nursing, financial. In addition, greater weight may be accorded to experience gained in more responsible areas of the facility.

The defense called Dr. Winfrey Link, who served on the Board for seventeen years, to testify about Roh's qualifications to enter an AIT program. The trial court permitted him to offer his personal opinion of Roh's qualifications and whether he thought her qualifications were acceptable under the Rules but made clear that the witness could not speak for the Board or predict what the Board might do. Link opined that "acceptable management experience" means "the actual practice of managing various departments within the nursing home itself. Managing can be the

supervising of department heads of various departments. Not having— as an example, to be the department head of housekeeping, but that the department head of housekeeping would report to you and you supervise their activities. But you must . . . be a manager, or responsible in all the areas, all the departments of the nursing home," he said. He also construed the Rules as authorizing but not requiring the Board to permit candidates to acquire their last six months of acceptable management experience while in an AIT program. According to Link, "regardless of the amount or duration of their management experience . . ., if they haven't had management or supervisory experience in every department of the nursing home," those candidates are not eligible to enter an AIT program. Based on the facts recounted in Roh's deposition and her testimony at trial, Link did not regard Roh as having sufficient acceptable management experience. In reviewing an application containing experience like Roh's, Link would recommend additional management training before entering an AIT program, because, he said, Roh had sufficient managerial experience in only one of six departments.

Roh disputes Link's assessment. She claimed that no one at Lakeshore ever told her that she did not have sufficient acceptable management experience. She testified that she managed workers or herself performed substantial functions in the nursing, medical records, medical supplies, admissions, infection control, housekeeping, and dietary fields. Yet cross-examination revealed the nature of this experience. After examining an organizational diagram of the Meadows facility, Roh was asked if she ever supervised people who work in various departments. Although some departments were small and she occasionally worked with and performed functions similar to those performed by members of each department, she never managed them or otherwise gained supervisory experience in any department other than nursing. Roh admitted that, while she had experience working with members of each department, she did not have management or supervisory experience in five out of the six departments at the time she left Lakeshore. At trial, Roh agreed with the

contemplate supervisory experience, not merely experience doing the work of the various departments.

Rule 1020— 1— .05(1)(j)(3) requires a candidate with Roh's education to obtain at least two years of "acceptable management experience," although Rule 1020— 1— .01(1) allows up to six months of that experience to be acquired while completing an approved AIT program. Though not a model of clear drafting, Rule 1020— 1— .01(1) defines "acceptable management experience," and appears in full *supra* p. 7. The definition repeatedly focuses on administration, responsible supervisory experience, and similar terms evoking the parent term's core word *management*. Although much of the defining passage uses permissive language and one sentence declares that "'Acceptable management experience' contemplates experience in all departments or areas of the facility" without reiterating that such experience be managerial, the definition as a whole displays an expectation of oversight, instruction, leadership, superintendence, and governance. Merely working in a department does not suffice. *See* Rule 1020— 1— .01(1) (defining acceptable management experience as "[t]he actual practice of health care facility *administration* in an inpatient health care facility with guidance and *sharing of responsibility* from the administrator . . . ." (emphasis added)). In short, the Rules expect *management*, the very word the definition attempts to define. In terms of requiring that candidates have specific experiences, the Rules call for sharing responsibility with the administrator and obtaining management experience— not merely *functional* experience— in each of the departments in a nursing home.

We thus conclude that a Tennessee court would construe the Rules as requiring at least some management or supervisory experience in each of the specified areas in order to satisfy the "acceptable management experience" requirement for someone with Roh's education. The Rules require 24 months of management experience. Since no more than two-thirds of this experience can come from management in a single department, at least eight months of

bears upon elements of the prima facie case can also come into play in assessing the ultimate question of discrimination." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 825, 827 (6th Cir. 2000) (citing *Reeves* and noting that nothing "prevent[s] the court from considering evidence that also bears on that prima facie case as long as it does so in order to address the ultimate question of discrimination"). On appeal, Lakeshore argues that Roh's discrimination claim fails as a matter of law because the alleged failure to promote comprised Lakeshore's not offering her a position in an AIT program and she did not meet the educational and experience prerequisites for state permission to enter such program. That is, she was unqualified for the job she sought.

At trial, the parties offered differing interpretations of the Rules: Roh argued that simple experience working in or handling the duties of each of the departments sufficed, while Lakeshore argued that the Rules called for *management* experience in each department, in the sense of supervising the work of ordinary department employees. The trial court did not resolve the meaning of the Rules, considering it a fact question for the jury. This was error. Issued under the authority of the General Assembly and regulating the right of citizens to enter a profession, the Rules operate with the force of Tennessee law. The district court should have interpreted the Rules and considered setting forth the facts and circumstances necessary for a candidate such as Roh to satisfy their requirements. Unfortunately, the jury had no guidance in resolving Roh's qualification in terms of her ability to satisfy the Rules' requirements for entering an AIT program other than the expert testimony of a former board member, who stated his interpretation of the Rules.

In order to determine whether a reasonable jury could have found Roh qualified for the position she sought, we must resolve whether the evidence adduced at trial supports the conclusion that Roh satisfied the state's requirements for entering an AIT program, as embodied in the Rules. The Rules' language leaves little room for argument: the Rules

assertion that she "did not at the time [she] left . . . employment with Lakeshore have management or supervisory experience in five out of the six departments." JA at 544.

## III.  PROCEDURAL HISTORY AND STANDARD OF REVIEW

Roh filed suit in state court against Lakeshore alleging religious and sex discrimination, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, the Equal Pay Act, 29 U.S.C. §201, and parallel provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.*, and the Tennessee Wage Regulations, Tenn. Code Ann. § 50-2-201 *et seq.* Lakeshore removed the case to federal court. By trial, only Roh's failure-to-promote religious discrimination claims under federal and Tennessee law remained, as Lakeshore disposed of the other claims on summary judgment. Roh has not appealed those adverse rulings. Ruling on Lakeshore's motion for summary judgment, the district court found "genuine issues of material fact as to . . . whether Plaintiff was qualified or could have become qualified, given different opportunities."

At the close of the plaintiff's case, Lakeshore moved for directed verdict, arguing that Roh failed to make out a prima facie case because her inability to comply with the state board's regulations meant that she was not qualified for the position she sought. Lakeshore argued that Tennessee law required prospective AIT-program enrollees with an associate's degree to have two years of acceptable management experience, meaning supervisory experience, with one-third of that experience beyond just the nursing department, which Roh admitted she did not have. Roh argued that the regulations do not require management experience in each department but instead call for any kind of experience working in or with the departments. The district court considered it "an old fashioned jury question," observing that "[t]here are facts in the evidence to support the theory of either party." The court decided to "allow the jury

to exercise its judgment as the fact-finder and apply the law as instructed in the jury charge."

The trial court appears to have considered the issue of Roh's qualifications entirely one of fact, as it never interpreted the Board's Rules and did not specifically resolve the question in deciding Lakeshore's pre-trial summary judgment motion. Still, nothing in the jury charge dealt specifically with resolving Roh's ability to obtain the Board's permission to enter an AIT program or otherwise addressed the nature of her qualifications. The charge mentioned only that a plaintiff must be qualified for the position she claims to have been denied because of her religion. The verdict form reports a general verdict on the Title VII claim and does not contain any specific findings with respect to Roh's qualifications for the AIT program. The jury returned a verdict in favor of Roh for $20,000 in back pay, $48,000 in compensatory damages, and $102,000 in front pay for violations of both federal and Tennessee law. The trial court denied Lakeshore's post-verdict renewed motion for judgment at a matter of law, *see* Fed. R. Civ. P. 50(b), and entered judgment in accordance with the jury's verdict. Lakeshore timely appealed.

This court reviews the grant or denial of a "directed verdict by the trial court under the same standard used by that court in determining whether or not it was appropriate to grant the motion" in the first instance. *Lewis v. City of Irvine*, 899 F.2d 451, 454 (6th Cir. 1990) (quoting *Sawchick v. E.I. DuPont deNemours & Co.*, 783 F.2d 635, 636 (6th Cir. 1986)). We must, without weighing the credibility of the witnesses, ascertain whether the record contains sufficient evidence from which the jury could find in favor of the party against whom the motion is made. *See ibid.* "Only when . . . reasonable people could come to but one conclusion from the evidence should a court grant a motion for directed verdict." *Id.* at 454-55.

## IV.  ROH'S TITLE VII CLAIM

*McDonnell Douglas* and its progeny established a burden-shifting regime for analyzing Title VII cases, allocating the burdens of production and persuasion. First, the plaintiff must establish a prima facie case of discrimination. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). In a failure to promote case, that comprises proof that i) plaintiff is a member of a protected class, ii) she was qualified for the position she sought, iii) she was rejected, and iv) the position remained open after her rejection or went to a less qualified applicant. Upon such proof a trier of fact presumes discrimination, and "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 253-54. "By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, [defendants] sustain[] their burden of production." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original). "In the nature of things, the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *Ibid.* When the defendant articulates a legitimate non-discriminatory reason for undertaking an adverse employment action, the plaintiff must introduce evidence that the proffered reason is a pretext for discrimination. If the plaintiff does so and proceeds to trial, "the *McDonnell Douglas* framework— with its presumptions and burdens— disappear[s], and the sole remaining issue [becomes] discrimination vel non." *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097, 2106 (2000) (internal quotations omitted, citing *St. Mary's Honor Center* and *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 (1983)).

A Court of Appeals "should not review the case for whether a prima facie case had been made, but rather, whether the ultimate issue of discriminat[ion] falls in the favor of the Plaintiffs or Defendant." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997). "Of course, evidence that