RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0278P (6th Cir.)
File Name: 03a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LAWRENCE E. ANTHONY, JR.,
*Plaintiff-Appellant,*

*v.*

BTR AUTOMOTIVE SEALING
SYSTEMS, INC.
*Defendant-Appellee.*

No. 01-6028

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 00-00315—James H. Jarvis, District Judge.

Argued: December 5, 2002

Decided and Filed: August 8, 2003

Before: COLE and CLAY, Circuit Judges;
BERTELSMAN, Senior District Judge.[*]

———————————

[*] The Honorable William O. Bertelsman, Senior United States District
Judge for the Eastern District of Kentucky, sitting by designation.

———————————

## COUNSEL

**ARGUED:** Stephen Talbert Hyder, Maryville, Tennessee,
for Appellant. Robert O. Sands, OGLETREE, DEAKINS,
NASH, SMOAK & STEWART, Atlanta, Georgia, for
Appellee. **ON BRIEF:** Stephen Talbert Hyder, Maryville,
Tennessee, for Appellant. Robert O. Sands, OGLETREE,
DEAKINS, NASH, SMOAK & STEWART, Atlanta,
Georgia, for Appellee.

BERTELSMAN, D. J., delivered the opinion of the court,
in which CLAY, J., joined. COLE, J. (pp. 20-22), delivered
a separate concurring opinion.

———————————

## OPINION

———————————

BERTELSMAN, District Judge. Plaintiff Lawrence E.
Anthony, Jr., appeals the district court's grant of summary
judgment to defendant on Anthony's claims for race and age
discrimination under Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in
Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, 42 U.S.C.
§ 1981, and the Tennessee Human Rights Act. For the
reasons set forth, this court AFFIRMS the district court.

### Factual Background

Plaintiff Lawrence E. Anthony, Jr., a black male over the
age of forty, was hired by defendant at the age of nineteen.
Beyond high school, Anthony attended the University of
Tennessee at Martin for approximately one year before his
employment with the defendant. Anthony does not possess
a college degree or Certified Quality Engineer "CQE" status.

Defendant BTR Automotive Sealing Systems, Incorporated ("BTR")[1] manufactures door seals for new automobiles, primarily sold to the "Big Three" automobile makers – General Motors, Ford and Chrysler. BTR has historically had three operations on site: the mixing plant and the extrusion plant[2] located within one building, and the finishing plant[3] located a few yards away. Each of the three operations had separate laboratories.

Anthony appeals the grant of summary judgment to BTR on his claims that BTR's refusal to promote him on four separate occasions was discriminatory based on his race and age.[4] He also appeals the grant of summary judgment by the district court four days before trial because by that time he had already expended money on witness per diem and service fees for the trial.

Anthony argues that he was a long-time faithful employee of BTR with a good work record, including never missing a day of work or being tardy. During his twenty-seven years

---

[1] BTR has been sold and is known now as Metzeler Automotive Profile Systems.

[2] In the extrusion plant after raw compounds and raw materials are blended together at the mixing plant to form rubber, the rubber compound is run through an extrusion dye. This subjects the rubber to heat and pressure. The final product is primarily door seals.

[3] The finishing plant is where extruded materials are taken and molded together, coated, and various secondary operations performed prior to packaging for shipment to the customer.

[4] At the district court level Anthony also sought relief for claims of discrimination for adverse employment actions related to his pay. The district court found the pay claims were barred for failure to include them in his EEOC action. Anthony did not appeal this ruling.

with BTR, he spent twenty-two years in the quality laboratory under the supervision of Debbie Massey.

Anthony maintains that, early in his employment, BTR's then-vice president for technical operations, John McManus, a graduate from the National College of Polymer Technology in London, taught Anthony directly from class notebooks. Anthony contends a jury should have been permitted to hear how this early experience in Anthony's employment "set the tone" for his loyalty and enthusiasm for the company during his employment and ultimately demonstrates that he was indeed qualified for the promotions.

The four promotions at issue include: (1) a job given to Tim Wilham in late 1997; (2) a job given to Mark Ledbetter in June of 1998 ; (3) a job given to Leann Abston in December of 1998; and (4) a job given to Rusty Kreyling in August of 1999. The facts of each promotion follow.

### *The promotion given to Tim Wilham*

In 1997, Debbie Massey, laboratory supervisor of the extrusion plant and supervisor to Anthony, transferred to the company's Rockford, Maryland office. Massey had a Bachelor of Science degree from the University of Tennessee with an additional year of education in chemistry and psychology. In addition to supervising Anthony, Massey supervised two other employees in the finishing and extrusion plant laboratories. Anthony had no responsibilities in the finishing plant. While Anthony was primarily performing lab tests for the extrusion lines, Massey was covering duties in a variety of locations, including incoming materials as well as the finishing plant.

Anthony maintains that he performed all supervisory and nonsupervisory duties in the laboratory when there was no supervisor after Massey was transferred. Anthony submitted his resume to Denny Moore, the human resources manager,

to apply for Massey's position. Moore told Anthony that BTR was not looking to fill the position as a laboratory supervisor and, instead, wanted to fill it with someone who was a CQE or who had a technical decree.

The job was given to Tim Wilham, a white male under the age of forty. He did not have a college degree and was not a CQE. Wilham began working for BTR as a production supervisor in December of 1994.

In 1997, Wilham had been assigned to work as a supervisor in the mixing plant. The mixing plant employees objected to Wilham's presence because of a previous arrangement between BTR and the union that a supervisor would not be assigned to this particular group of employees. J.W. Burton, the operations manager, and Terry Brosi, the general manager, conceded to the employees' request for Wilham's removal, which was determined not to be through any fault of Wilham. Because Wilham was an experienced supervisor for BTR, the company did not want to terminate him. According to BTR, Brosi and Burton assigned Wilham to Massey's former position as a laboratory supervisor because there was no other place to put him. This was considered only a temporary placement for Wilham until another position was available for him.

Moore testified that neither Wilham nor Anthony was qualified for the position. However, Brosi and Burton made the promotion decision. After Wilham's initial period in the laboratory, the company decided it was not going to work out and that Wilham was not qualified. Within a few months he was transferred to another position.

### *The promotion given to Mark Ledbetter*

After Wilham was moved out of the position, BTR maintains it determined that it would seek candidates for the position who were qualified as quality engineers. BTR

preferred someone with a college degree, technical background or CQE credentials to succeed Wilham, instead of a lab supervisor. BTR further contends that prior experience within the automotive supply industry to the "Big Three" automakers was considered a plus.

In May of 1998, Patrick Hood was employed as a quality manager while BTR was undergoing an attempt to improve its quality standards and regain a "Ford Q1" status. This status would require the implementation of the new standard of quality within the industry, designated as QS-9000.[5] BTR maintains that it needed to change its approach to quality oversight by attempting to identify the root cause of problems, rather than testing materials after the fact.

Hood hired Mark Ledbetter, a white male under the age of forty, to fill the position in June of 1998. Ledbetter had a CQE status, a technical education, and experience within the automotive industry. Ledbetter's job comprised more than just supervising the extrusion lab. His duties also included identifying and solving problems, conducting designs of experiments, performing statistical studies to bring processes in control, and generally identifying and developing better test procedures.

### *The promotion given to Leann Abston*

Ledbetter quit after five months to take another job in November of 1998. At that time Leann Abston, a white female under the age of forty, replaced him as the quality engineer responsible for the projects which Ledbetter had been doing as well as supervising Anthony in the extrusion lab. Abston was a CQE who had been employed by BTR

---

[5]The QS-9000 system is a set of standards adopted by the automotive industry to ensure that all suppliers are held accountable to the same set of standards governing their production, reporting, and systems.

since October 1991 in various quality engineer/supervisor positions within the quality assurance department. She had a significant educational background, including an engineering degree and a master's degree in business administration. She also had previous automotive experience with the Ford Motor Company.

Abston had been selected for a reduction in force in early 1998. After she contested this decision, she was reinstated during late 1998. Since Ledbetter departed about the same time, Abston was given Ledbetter's position because BTR had agreed to return Abston to work. While Hood testified that Abston was technically qualified to perform the job, he did have reservations about her personality and her absenteeism from work. Nonetheless, he was told by the acting interim general manager at that time that Abston was coming back to work in quality engineering.

### The promotion given to Rusty Kreyling

Abston resigned in August of 1999, and Rusty Kreyling was hired permanently in early 1999 to work as a quality technician in the finishing plant. Kreyling was considered highly qualified by Hood because of his degree in statistics from the University of Tennessee and his advanced knowledge of statistics. Kreyling was not a CQE. Nonetheless, because of his statistics degree, Hood testified that Kreyling was more qualified than other CQEs with whom he had worked in the past.

### BTR's reasons for not promoting Anthony after Wilham was transferred

While Hood was aware of Anthony's interest in a laboratory supervision position, he explained to Anthony that he had no such position available after Wilham was moved. Wilham was the only one of the individuals above who was

ever designated as a laboratory supervisor. The other three were quality engineers.

Hood also testified concisely in his deposition that BTR wanted someone with a technical degree or a CQE status for the position. Hood was also looking for someone with experience in statistical studies, experiment design, QS-9000 administration, one-on-one customer problem solving, and PPAPs.[6] The persons hired after Wilham all had these or equivalent qualifications according to Hood.

Hood testified that the majority of Anthony's job included the testing of parts and entering the data. Anthony also filed certain documentation in regard to the QS-9000 as a clerk would. He had never done any statistical studies or designed any experiments. According to Hood, Anthony "[s]imply wasn't qualified, hands down." When asked to summarize why Anthony was not qualified, Hood testified in his deposition:

> [H]e doesn't have a technical degree, number one, he doesn't have a certified quality engineer by his name, he hasn't done root cause problem solving involving design of experiments, he doesn't have the statistical knowledge to do more than – anymore than input data into a computer and hit a button and have it print out. Analyzing what that data means, he doesn't have any background in that.

(J.A. at 272).

---

[6] PPAPs are "part approval processes" which means getting new parts approved.

### Standards of Review

A court of appeals reviews the grant of summary judgment *de novo. Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1990). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In conducting the summary judgment analysis, this court must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *See Gen. Elec. Co. v. G. Siempelkamp GmgH & Co.*, 29 F.3d 1095, 1097-98 (6th Cir. 1994).

On the granting of summary judgment so close to trial in regard to the district court's controlling its docket, the court of appeals reviews such for an abuse of discretion. *See generally Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320 (5th Cir. 1996).

### Analysis

A.  *Whether Anthony met the statute of limitations under 42 U.S.C. § 1981*

We first address BTR's argument that Anthony's § 1981 claim is barred by Tennessee's one-year statute of limitations.

Anthony asserted his discrimination claims, in part, under 42 U.S.C. § 1981. Originally enacted in 1870, § 1981 provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right in

every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981. Section 1981 thus prohibits racial discrimination in the making of contracts and affords a federal remedy against racial discrimination in private employment. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460-61, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975). In 1989, however, the Supreme Court held that while the "make and enforce contracts" language of § 1981 proscribed discriminatory hiring, it did not proscribe discriminatory termination or other discriminatory actions occurring after the employment relationship was formed. *Patterson v. McLean Credit Union*, 491 U.S. 164, 177-78, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989).

In the wake of *Patterson*, Congress passed the Civil Rights Act of 1991, which amended § 1981 by designating its original text, quoted above, as subsection (a) and by adding a new subsection (b) to define the term "make and enforce" contracts to include "[t]he making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *See* 42 U.S.C. § 1981(b). This amendment effectively reversed *Patterson* and permitted the use of § 1981 to challenge alleged race discrimination not only in the formation of the employment relationship, but in "post-formation" employment actions as well.

Thus, the 1991 amendments to § 1981 created "liabilities that had no legal existence before the 1991 Act was passed." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313, 114 S. Ct. 1510, 1519-20, 128 L. Ed. 2d 274 (1994); *see also Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1186-87 (10th Cir. 2002) ("The Civil Rights Act of 1991 . . . essentially created a new cause of action to challenge an employer's discriminatory post-formation conduct."); *Young v. Sabbatine*, No. 97-5169, 1998 WL 136559, at *3 (6th Cir. Mar. 19, 1998) (noting that

the 1991 amendments were "not merely restorative" but created new substantive liabilities) (citing *Rivers, supra*).

This review of the history of 42 U.S.C. § 1981 is essential to the analysis of which statute of limitations applies to § 1981 claims such as those asserted in this case.

Section 1981 does not contain its own statute of limitations. In *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661, 107 S. Ct. 2617, 2620, 96 L. Ed. 2d 572 (1987), the Supreme Court held that federal courts should select the most appropriate or analogous state statute of limitations to apply to § 1981 claims. The Sixth Circuit thus held that the limitations period for § 1981 actions in Tennessee was the state's one-year limitation period set forth in Tenn. Code Ann. § 28-3-104. *See Jackson v. Richards Med. Co.*, 961 F.2d 575, 578 (6th Cir. 1992).

However, on December 1, 1990, Congress passed 28 U.S.C. § 1658, a general statute of limitations applicable to all federal statutes enacted after that date, which states in pertinent part: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of enactment of this section may not be commenced later than *4 years* after the cause of action accrues." 28 U.S.C. § 1658 (emphasis added).

The question of how, if at all, the passage of 28 U.S.C. § 1658 affected the statute of limitations for § 1981 claims is one that has divided the federal courts. *See Harris*, 300 F.3d at 1187 (noting that the federal courts "have split in determining which statute of limitations applies to suits brought under the amended version of § 1981"); *see also Jones v. R.R. Donnelley & Sons Co.*, 305 F.3d 717, 728 (7th Cir. 2002) (noting division among circuits and holding that 28 U.S.C. § 1658 does not apply to § 1981 claims), *cert. granted*, __ U.S. __, 123 S. Ct. 2074 (2003).

The Third Circuit, in 2000, discussed three different approaches that courts have taken. *Zubi v. AT&T Corp.*, 219 F.3d 220, 222 (3d Cir. 2000). Summarized briefly, they are: (1) that claims created by the Civil Rights Act of 1991 amending § 1981 should be subject to the new four-year statute of limitations, but all other claims remain subject to the state "borrowed" period; (2) that *all* § 1981 claims accruing after the passage of 28 U.S.C. § 1658 are now subject to the four-year limitations period; and (3) that the Civil Rights Act of 1991 merely amended an existing law and was not a new enactment for purposes of 28 U.S.C. § 1658, and thus all § 1981 claims remain subject to the state "borrowed" limitations period. *Id.*

The Third, Seventh, and Eighth Circuits presently hold that 28 U.S.C. § 1658 does not apply to any claims under § 1981, whether arising under its original text or under the 1991 amendments. *See Jones*, 305 F.3d at 728; *Madison v. IBP, Inc.*, 257 F.3d 780, 798 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 919, 122 S. Ct. 2583, 153 L. Ed. 2d 773 (2002) (mem.); *Zubi*, 219 F.3d at 225.

In contrast, the Tenth Circuit recently held that 28 U.S.C. § 1658's four-year statute of limitations applies to § 1981 claims that were created by the 1991 amendments (e.g., claims under § 1981(b)). *See Harris*, 300 F.3d at 1191. The Eleventh Circuit has been presented with the issue but has not ruled on it. *See Taylor v. Ala. Intertribal Council Title IV J.T.P.A.*, 261 F.3d 1032, 1034 (11th Cir. 2001) (affirming dismissal of § 1981 claims on qualified immunity grounds and not reaching statute of limitations issue), *cert. denied*, 535 U.S.1066, 122 S. Ct. 1936, 152 L. Ed. 2d 841 (2002) (mem.).

Several years ago, we recognized this question but did not have occasion to resolve it. *Sabbatine*, 1998 WL 136559, at *3. Again last year, we were presented with the issue but explicitly declined to express a view on the merits because we did not have jurisdiction. *See Smith v. County of Hamilton*,

34 Fed. Appx. 450, 455, No. 00-4290, 2002 WL 655524 (6th Cir. Apr. 19, 2002) (unpublished).[7]

In *Sabbatine*, the plaintiff invoked § 1981 to allege that his employer had created a racially discriminatory hostile work environment and that it had failed to promote him on account of his race. 1998 WL 136559, at *1. The district court dismissed the § 1981 claims as untimely under the one-year statute of limitations borrowed from Kentucky. *Id.* at *3. We reversed and remanded, stating that the district court should consider the application of the four-year limitation period in 28 U.S.C. § 1658 in light of the 1991 amendments to § 1981.[8] *Id.*

Several district courts within this circuit have since held that the four-year limitations period of 28 U.S.C. § 1658 should now apply to § 1981 claims, in whole or in part. *See Kinley v. Norfolk Southern Ry. Co.*, 230 F. Supp. 2d 770, 776 (E.D. Ky. 2002) (applying four-year limitations period to failure to promote claims); *Brown v. Jenny Craig Weight Loss Ctr.*, No. C-1-97-0211, 2000 WL 989918 (S.D. Ohio May 2, 2000) (holding that four-year statute of limitations should apply to all portions of § 1981); *Miller v. Fed. Express Corp.*, 56 F. Supp. 2d 955, 964-65 (W.D. Tenn. 1999) (applying

---

[7] We note that the Supreme Court recently granted certiorari in the *Jones* case out of the Seventh Circuit, indicating that it will likely soon resolve the issue. *See Jones v. R.R. Donnelley & Sons, Inc.*, 305 F.3d 717 (7th Cir. 2002), *cert. granted*, __ U.S. __, 123 S. Ct. 2074 (2003). Nonetheless, this panel must proceed to address the issue in this case as best it can based on the authorities currently available.

[8] On remand, the district court concluded that 28 U.S.C. § 1658 did extend the statute of limitations for the plaintiff's § 1981 claims to four years. *See Young v. Sabbatine*, No. 99-6336, 2000 WL 1888672, at *2 n.2 (6th Cir. Dec. 19, 2000) (so noting, and holding that the Sixth Circuit had no jurisdiction to consider the issue on this second appeal because the employer did not file a notice of cross-appeal to preserve the issue).

four-year statute of limitations to § 1981 claim alleging racially discriminatory termination); *Rodgers v. Apple South, Inc.*, 35 F. Supp. 2d 974, 976-77 (W.D. Ky. 1999) (holding that four-year statute of limitations should apply to all § 1981 claims). *But see Coleman v. Shoney's, Inc.*, 145 F. Supp. 2d 934, 938 (W.D. Tenn. 2001) (holding that § 1658 does not apply to any claim under § 1981).

We now hold that the four-year statute of limitations set forth in 28 U.S.C. § 1658 does indeed apply to § 1981 claims insofar as they arise under the portion of the statute enacted by the Civil Rights Act of 1991. That legislation undisputably created new legal rights that did not exist prior to its passage. *See Rivers*, 511 U.S. at 313, 114 S. Ct. at 1519-20. Section 1981 claims premised upon alleged discriminatory actions occurring after the formation of the employment relationship, such as the failures to promote at issue in this case, are thus actionable under § 1981 only by virtue of legislation enacted after December 1, 1990, and by its terms 28 U.S.C. § 1658 therefore applies to them.

In this regard, we are in agreement with the reasoning of the Tenth Circuit in *Harris*, *supra*. We also agree, as expressed in *Harris*, that the fact that this statutory construction results in "post-formation" § 1981 claims being subject to a four-year limitations period and "formation" claims remaining subject to the borrowed state limitations period does not change this analysis. 300 F.3d at 1193. As the Tenth Circuit noted, "courts routinely apply different statutes of limitations to different claims, including claims made within a single lawsuit." *Id.* Particularly within the realm of employment law, where rights may be, and are typically, asserted under both federal and state law, litigants and courts routinely deal with differing limitations periods for related causes of action. While this result may not yield the greatest simplicity, it does reflect what we believe to be the most faithful reading of these statutes.

*B.   Whether the district court erred in granting summary judgment to BTR on Anthony's claims    of racial and age discrimination*[9]

Anthony alleges discrimination by BTR's refusal to promote him allegedly based on his race and age.  In order to establish employment discrimination, Anthony must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). Anthony relies on circumstantial evidence and presents no direct evidence.

The burden-shifting approach under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which was later refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), applies to the present case.  Under this framework, Anthony faces the initial burden of presenting a prima facie case of discrimination.  The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires BTR to articulate some legitimate, nondiscriminatory reason for taking the challenged action.   BTR's burden is only one of production, not persuasion. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001) (citing *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093).  The ultimate burden of persuasion remains with Anthony.  *Id.*  If BTR produces legitimate nondiscriminatory reasons, Anthony must prove BTR's reasons are a pretext for discrimination.

---

[9]Anthony's claims of discrimination under different statutes require the same standards of proof and therefore will not be analyzed separately. *See Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001).

In order to make a prima facie case based upon a failure to promote, Anthony must prove that (1) that he is a member of a protected class; (2) that he applied for, and did not receive, a job; (3) that he was qualified for the job; and (4) that a similarly-situated person who was not in the plaintiff's protected class received the job.[10] *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1166 (6th Cir. 1996); *see also Burdine*, 450 U.S. at 254 (citing *McDonnell Douglas*, 411 U.S. 792).  *Cf. Seay v. TVA*, No. 01-5953 (6th Cir.  2003).

### The Wilham promotion

Anthony, as an African-American over the age of forty,[11] is indeed within the protected race and age classes.  He applied for the promotion, but it was denied to him.  It is the remaining requirements of a prima facie case that are at issue on the Wilham promotion.

On whether he was considered for the promotion, Denny Moore, the human resources manager, testified that Anthony gave him his resume.  At that time BTR was not looking for a laboratory supervisor, the position which Anthony sought.

---

[10]We note that in *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 603 (6th Cir. 2002) and *Roh v. Lakeshore Estates, Inc.*, 241 F.3d 491, 497 (6th Cir. 2001), this Court stated that the fourth prong could be met if the position went to a less-qualified applicant who was not a member of the protected group.  This standard conflicts with or ignores prior published decisions of this Court using the "similarly situated" standard. *See, e.g.*, *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000); *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999); *Betkerur v. Aultman Hosp.  Ass'n*, 78 F.3d 1079, 1095 (6th Cir. 1996); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Brown v. Tenn.*, 693 F.2d 600, 603 (6th Cir. 1982).  We, therefore, decline to adopt the "less-qualified" language used in *Farmer* and *Roh* because it deviates from prior precedent.

[11]Anthony was forty-three years of age when the first promotion went to Wilham.

Instead, BTR was searching for someone with a degree and CQE status. It is not disputed that Anthony did not have these qualifications and was not interviewed. While ordinarily the fact that a candidate did not have the proper credentials for a position might excuse the employer from not considering him, we continue with the prima facie case because the position was filled by Wilham, who also did not have the proper credentials. Moore testified that neither Wilham nor Anthony was qualified for the position. A plaintiff should not be required to prove that he is qualified to meet the stated requirements for a position where the selected candidate likewise does not meet the requirements.[12]

On the final prong of the prima facie case, neither Anthony nor Wilham met the stated criteria for the actual position BTR sought to fill with a quality engineer, but both had experience which could make them viable candidates for a laboratory supervisor. Accordingly, they can be considered similarly situated for the purposes of reviewing Anthony's failure-to-promote claim. Hence, this Court finds that Anthony has met his prima facie case.

The burden now shifts to BTR to articulate a legitimate, nondiscriminatory reason for placing Wilham in the position. BTR removed Wilham as supervisor of the mixing plant due to an agreement with the union, and it did not want to terminate him. Placing Wilham into Massey's former position was necessary because BTR did not have any other position at that time for Wilham. Anthony has presented no evidence to the contrary.

---

[12]There may be instances where a deviation from the stated criteria of a job position would result in an inference of discrimination. *See e.g.*, *Briggs v. Anderson*, 796 F.2d 1009, 1026 (8th Cir. 1986). Under the particular facts of this case, no such inference is warranted.

To make a submissible case on the credibility of BTR's explanation, Anthony is "'required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the employment action], or (3) that they were *insufficient* to motivate [the employment action].'" *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (alteration in original) (citing *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)).

Anthony has failed to show that BTR's reasons are pretextual. He does not present any evidence showing BTR's reasons were not based in fact or that they were not the real reasons for its decision. Anthony only presents his own qualifications on the issue of pretext, and this is insufficient.

### The quality engineer promotions

As to the position after Wilham was moved, BTR only sought out candidates with the necessary qualifications it deemed essential in a quality engineer. The real issue here is whether Anthony was qualified for the position of quality engineer. Hood testified that Anthony was not qualified "hands down." The person BTR wanted for the position was someone with a technical/statistical background or degree or someone who was a CQE. Experience with the "Big Three" motor companies was also considered a plus.

It is undisputed that Anthony did not have these qualifications, while the three persons who received the promotions did. Although Anthony argues that his experience and background made him as well qualified as the other candidates, we cannot say in the mind of BTR that this was equivalent to a college degree, a CQE status, or the other objective qualifications which BTR sought in a quality engineer. Accordingly, Anthony was not qualified for the position, and he has failed to establish a prima facie case. *See Wexler*, 317 F.3d at 576 (holding that in determining whether

plaintiff has satisfied qualification prong of prima facie test, inquiry should focus on objective criteria).

*C. Whether the district court abused its discretion in granting summary judgment to BTR four days before trial*

Anthony complains because the district court waited until four days before trial to issue its decision on summary judgment. However, trial courts have inherent power to control their dockets. *See, e.g.*, *Gould v. Wood/Chuck Chipper Corp.*, Nos. 99-1544, 99-1707, 2000 WL 1234334 (6th Cir. Aug. 25, 2000); *Oliva v. Sullivan*, 958 F.2d 272 (9th Cir. 1992); *Edwards v. Cass County, Tex.*, 919 F.2d 273 (5th Cir. 1990); *Polk-Osumah v. Wayne County, Mich.*, 205 F.R.D. 199 (E.D. Mich. 2001); *U.S. v. Reaves*, 636 F. Supp. 1575, 1578 (E.D. Ky. 1986 ). The timing of trials and docket control are matters best left to the discretion of the trial court. *In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir. 1996). We cannot say that the district court's granting summary judgment four days before trial was an abuse of discretion, considering the heavy caseloads under which the district courts labor. Plaintiff is better off than he would be if the district court had granted judgment as a matter of law at the close of plaintiff's evidence.

For the reasons stated, we AFFIRM the district court.

_____

**CONCURRENCE**

_____

R. GUY COLE, JR., Circuit Judge, concurring. Anthony's Title VII and ADEA claims relating to the positions filled by Wilham and Ledbetter are time-barred and, therefore, no longer actionable. Likewise, Anthony's Tennessee Human Rights Act claims relating to the positions obtained by Wilham, Ledbetter, and Abston are time-barred, as they were not filed within the one-year statute of limitations period. Finally, under our established precedent, Anthony's § 1981 claims are subject to a one-year statute of limitations period. *See Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (explaining that "[b]ecause § 1981 does not specify a statute of limitations, [courts must] apply the one-year limitations period from Tenn. Code Ann. § 28-3-104." (citing *Jackson v. Richards Med. Co.*, 961 F.2d 575, 578 (6th Cir. 1992)). Today, the majority supplants the well-established rule that the statute of limitations for § 1981 claims must be borrowed from an analogous state statute insofar as that rule applies to claims "aris[ing] under the portion of [§ 1981] enacted by the Civil Rights Act of 1991." I write separately because I believe there are no claims that arise under the portion of § 1981 enacted under the Civil Rights Act of 1991, and because I believe 28 U.S.C. § 1658 was not intended to apply to § 1981 as amended or otherwise.

Although, § 1981(b) allows new causes of action in that it allows plaintiffs to bring previously unavailable claims – claims arising out of discriminatory conduct that occurs after the private employment relationship is formed – § 1981(b) alone cannot give rise to these causes of action. Instead, § 1981(b) defines the phrase "make and enforce contracts" as that phrase is used in § 1981(a). Specifically, as the majority notes, in reaction to the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1987),

§ 1981(b) was added to define that phrase more broadly than it had previously been defined. However, § 1981(a), entitled "Statement of equal rights," is still the source of substantive rights in the statute. Because § 1981(b) is merely definitional, it functions only to broaden the scope of causes of action that arise under § 1981(a). Section 1981(b) does not, in and of itself, provide the basis for any causes of action. Therefore, the "new causes of action" that are now permitted as a result of the inclusion of § 1981(b) are actually § 1981(a) claims. Thus, I would find that § 1981 post-formation claims simply arise under § 1981(a), which is a statute enacted prior to the effective date of 28 U.S.C. § 1658, December 1, 1990. This finding renders the § 1658 limitations period inapplicable to § 1981 post-formation claims.

Alternatively, even assuming that a post-formation claim arises under both § 1981(a) and (b),[1] § 1658 is at least ambiguous as to whether Congress intended its "catchall" four-year statute of limitations to apply to these claims. The language of § 1658 simply does not address the eventuality when a cause of action "aris[es] under" two different "Acts of Congress," one enacted before and one enacted after December 1, 1990. *See Jones v. R.R. Donnelley & Sons, Co.,* 305 F.3d 717, 724 (7th Cir. 2002). Thus, I would look beyond the plain language of § 1658 to determine whether it was intended to apply to post-formation § 1981 claims.

The legislative histories of § 1658 and the Civil Rights Act of 1991 suggest that Congress did not intend § 1658's four-year limitation period to apply to § 1981 post-formation claims. As the Seventh Circuit explained, § 1658 was enacted to "alleviate the uncertainty inherent in the practice of

---

[1] For the reasons described above, I believe that no claim will ever arise *solely* under § 1981(b). However, for purposes of argument, I will concede that a § 1981 post-formation claim could be viewed as arising under *both* subsections (a) and (b) of § 1981.

borrowing analogous state statutes of limitations for federal causes of action that do not contain their own limitations periods." *Id.* at 725 (citing H.R. Rep. No. 101-734, at 24). Moreover, § 1658 "was also concerned with disrupting litigants' settled expectations." *Id.* (explaining that, to address this concern, Congress made § 1658 prospective). I agree with the Seventh Circuit that the conclusion that § 1658's four-year limitation period does not apply to § 1981 post-formation claims is consistent with Congress's two purposes in enacting § 1658. *Id.* at 726-27. Likewise, I believe that the legislative history of § 1981 supports this conclusion. *Id.* at 727 (citing H.R. Rep. No. 102-40(I), at 63 (1991), U.S. Code Cong. & Admin. News 1991, at 601).

Thus, I would find that Anthony's § 1981 claims relating to the positions filled by Wilham, Ledbetter, and Abston, but not Kreyling, are time-barred. With respect to the claims that are not time barred, Anthony's Title VII, ADEA, and § 1981 claims relating to the position filled by Kreyling and Anthony's Title VII and ADEA claims relating to the position filled by Abston, I would deny these claims on the merits for the reasons stated by the majority.