Janice MCNEAIL–TUNSTALL,
Plaintiff,

v.

MARSH USA, Fred Higgins, and Mark Overheim, Defendants.

No. 02–2788–DA.

United States District Court,
W.D. Tennessee,
Western Division.

March 8, 2004.

Janice McNeail–Tunstall, Memphis, TN, Pro se.

Paul E. Prather, Sylvia Adams, Kiesewetter, Wise, Kaplan, Schwimmer & Prather, Memphis, TN, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DONALD, District Judge.

Before the Court is the motion of Marsh USA ("Marsh"), Fred Higgins ("Higgins"), and Mark Overheim ("Overheim") (collectively "Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure 56. Janice McNeail–Tunstall ("Plaintiff") brought this complaint alleging employment discrimination and negligent and intentional infliction of emotional distress by Defendants. For the following reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.

### I. Factual Background

Plaintiff is an African–American female. (Mem. in Opp'n of Defs.' Marsh USA, Fred Higgins & Mark Overheim's Mot. for Summ. J. ("Mem in Opp'n"), Ex. 7.[1]) Plaintiff began her employment with Marsh on January 12, 2000, as a Team Leader in the Agency Bill subdivision of the Premium Accounting department at Marsh's Finance Center in Memphis, Tennessee ("Finance Center"). (McNeail–Tunstall Dep. at 16.) Plaintiff transferred to the Direct Bill subdivision of the Premium Accounting department as a Team Leader in October 2000. (*Id.* at 19.) Plaintiff remained

---

**1.** The Court notes Defendants' objection to its consideration of all documents attached to Plaintiff's response memorandum as being unauthenticated. Although generally unauthenticated documents are unavailable for the Court to consider on summary judgment, the Court makes an exception here where Plaintiff proceeds pro se, Plaintiff later filed a sworn affidavit, and it appears to have been only a misunderstanding of the legal technicalities that caused Plaintiff to omit sworn testimony from her previous submissions.

in Direct Bill until her termination on June 18, 2002. (McNeail–Tunstall Aff. ¶ 1.[2]) Plaintiff was not given any orientation or training when she began working for Marsh, and she had to ask other team leaders and watch her team members to determine what to do. (McNeail–Tunstall Dep. at 16.)

Plaintiff initially reported to Bob Coons, until he was terminated for performance deficiencies on June 30, 2000. (Fields[3] Aff. ¶ 3.) When Higgins began his employment with Marsh on August 31, 2000, as the Manager of the Premium Accounting department, he became Plaintiff's direct supervisor. (Id. ¶ 4.) Higgins reports to Overheim, who is the Senior Vice President and Functional Manager of the Finance Center. (Id. ¶ 5.)

Higgins began to note deficiencies in Plaintiff's performance starting in early 2001. (Higgins Aff. ¶ 3.)

On February 7, 2001, Overheim sent an email to Plaintiff asking why two checks were not cleared by the end of the month and expressing his frustration at employees who do not take initiative to resolve issues. (Overheim Aff., Ex. 1.) In a responding email, Plaintiff explained that the errors were due in part to lack of communication and cooperation with another team. (Id.) Plaintiff then sent another email explaining a procedure she implemented to deal with similar problems. (Id.)

On June 13, 2001, Higgins sent an email to Overheim documenting three incidents that he felt showed problems with Plaintiff's performance. (Id.) Two instances involved work that Plaintiff should have handled herself but instead gave to another employee. The third instance involved Plaintiff "just kind of lingering" around other employees while the other employees were working. (Id.) Overheim responded to Higgins by email, describing another instance in which he felt Plaintiff tried to pass work off to another employee and in which she had made an error issuing a check that she could neither explain nor recognize. (Id.)

On June 21, 2001, Higgins sent Overheim an email describing a one and a half hour discussion with Plaintiff about the need for her to develop in her position. (Id.) Plaintiff specifically denies that the referenced discussion ever took place. (McNeail–Tunstall Aff. ¶ 5.)

On August 23, 2001, Elizabeth Pinitsch, an employee in Marsh's Nashville, Tennessee office, sent an email to Overheim stating that she felt Brenda, a member of the Direct Bill team, did not understand her role and probably had not received adequate training. Ms. Pinitsch also refers to a lack of business understanding at the team leader level throughout the previous year. (Overheim Aff., Ex. 1.) The parties dispute whether Plaintiff was Brenda's su-

2. The Court notes Defendants' objections to Plaintiff's late-filed affidavit, that (1) Plaintiff merely recites her own opinions of certain events, and those opinions contradict her earlier sworn deposition testimony, in which she stated that she had no knowledge of those events; (2) paragraph twenty-two is inadmissible on summary judgment, because it contains hearsay and is not based on personal knowledge of Plaintiff; and (3) Plaintiff could not have "inadvertently forgot" to submit the affidavit with her response to Defendants' summary judgment motion, as it is dated over

one month after submission of that response. (Defs. Marsh USA, Fred Higgins & Mark Overheim's Resp. to Pl.'s Aff.) The Court limits its consideration of Plaintiff's affidavit to that portion of the material that is not contradicted by other sworn testimony and that is admissible on summary judgment under Rule 56.

3. Ann Fields is the Human Resources Manager for the Finance Center and has been an employee of Marsh since March 16, 1987. (Fields Aff. ¶ 1.)

pervisor in the time referred to in Ms. Pinitsch's email.

On November 20, 2001, Higgins sent Plaintiff an email stating that "follow up dates have come and gone" for clearing items that they told Overheim they would clear. He states that "[t]his may not be acceptable." (*Id.*)

On December 3, 2001, Overheim sent an email to Higgins and Plaintiff regarding mistakes that had been made in November. Overheim stated that procedures had been issued recently on the issue, and he inquired as to what had happened. (*Id.*) Plaintiff explained the problem as "an act of not paying attention" and stated that she was addressing the importance of getting it right the first time with two of her team members. (*Id.*)

On December 18, 2001, Overheim sent Plaintiff an email inquiring what happened on an account that Plaintiff had previously confirmed was resolved, but that still carried a balance. Overheim asked to talk to Plaintiff about the matter. (*Id.*)

On January 8, 2002, Overheim, Higgins, and Plaintiff had a meeting, which was documented in a memorandum dated January 10, 2002. (Overheim Aff., Ex. 2.) The memorandum listed the following issues regarding Plaintiff's performance. First, several significant errors and oversights occurred regarding the year end EBS accrual process. Overheim contended that common sense would have revealed the errors to Plaintiff and that the responsibility for making sure the process was done correctly rested with Plaintiff. (*Id.*) Plaintiff agreed that she had made the mistake. (McNeail–Tunstall Dep. at 70.) Second, Plaintiff had told Overheim that a balance in one account had been cleared, when it actually had a balance of $225,484.95; while that balance was reduced to $1,232.36 by the end of the year, the length of time resulted in an understatement of revenue for the firm. (Overheim

Aff., Ex. 2.) Plaintiff maintains that part of the fault for this error rested with Marsh's Atlanta, Georgia office, the employees of which did not complete their work on a timely basis. (McNeail–Tunstall Dep. at 70–73.) Third, Overheim had received communications from the local offices regarding Plaintiff's lack of involvement and contact with the local offices, an item that had been brought to Plaintiff's attention several months previously. Fourth, there had been several incidents of miscoding, even after clearly written guidelines were issued. Overheim contended that Plaintiff's team oversight and her own performance were substandard, and he wrote that Plaintiff agreed that she had not met established standards and that she would work to correct her performance. Overheim warned Plaintiff that lack of significant progress could result in further disciplinary action and indicated that both he and Higgins were available and willing to help her, would monitor her performance, and would provide biweekly feedback to her. (Overheim Aff., Ex. 2.)

On January 11, 2002, Overheim sent Plaintiff an email asking why an item had not been accrued. (Overheim Aff., Ex. 3.) Plaintiff responded that there was no excuse for the error. (*Id.*)

On January 14, 2002, Higgins sent an email to Plaintiff discussing the fact that she had made an employment reassignment in Marsh's Knoxville, Tennessee office without consulting either him or the appropriate representative in the Knoxville office. (Higgins Aff., Ex. 4.) Plaintiff contends that no written procedures existed for this process and that she had made similar employee reassignments before without being told that she had done them incorrectly. (McNeail–Tunstall Dep. at 83–84.)

On February 8, 2002, Plaintiff sent Overheim an email requesting a phone num-

ber for a carrier. (Mem. in Opp'n, Ex. 5.) Overheim responded by email, stating that her "lack of resourcefulness on this one is astonishing" and offering her several ways to find the information. (*Id.*) Plaintiff forwarded Overheim's response to Ms. Fields, claiming that she found "this attack to be very belittling and intimidating." (*Id.*) Plaintiff met with Ms. Fields the following week to discuss the email. (McNeail–Tunstall Dep. at 100.) After being told by Ms. Fields to be more careful when addressing his employees, Overheim later apologized to Plaintiff. (Overheim Aff. ¶ 10.)

On February 12, 2002, Higgins sent an email to Overheim and Ms. Fields stating that credibility problems continued to exist for Plaintiff. Higgins mentioned two incidents, one in which a coworker "begged" him not to send her on a trip with Plaintiff, because it would threaten that co-worker's own credibility, and a second in which another co-worker left her office because Plaintiff was shouting so loudly at Higgins. (Higgins Aff., Ex. 5.) In a February 13, 2002 email from Higgins to Overheim and Ms. Fields, Higgins described a second instance in which a co-worker had asked not to be sent on an office visit with Plaintiff because Plaintiff was unable to explain their work. (Higgins Aff., Ex. 6.)

On February 15, 2002, Overheim, Higgins, and Plaintiff had another meeting. Overheim and Higgins acknowledged that Plaintiff had made some improvements but notes that there were still key performance areas that were well below standard. (*Id.* ¶ 14.) Overheim asked Plaintiff how she felt she was performing, and whether she felt that she was performing on the same level as the other team leaders. (Overheim Supplemental Aff. ¶ 7.)

On February 20, 2002, Higgins sent an email to Overheim and Ms. Fields documenting an incident in which Plaintiff attempted unsuccessfully to train an employee, who then had to seek training from a different person. (Higgins Aff., Ex. 8.)

On March 12, 2002, Higgins told Plaintiff that, because of her problems in her position as team leader, he could offer her a position as a technician/individual contributor in the Atlanta office. The other team leaders each held this position before becoming team leaders, although Plaintiff had not. (Higgins Aff. ¶ 13.) The Atlanta position was a demotion from the team leader position and meant a twenty percent pay cut. Plaintiff felt belittled and insulted by this offer. (McNeail–Tunstall Dep. at 122–23; McNeail–Tunstall Aff. ¶ 14.)

On March 14, 2002, Plaintiff filed her first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Fields Aff., Ex. 1.) Overheim and Ms. Fields decided not to inform Higgins of the EEOC charge. (Overheim Aff. ¶ 19.)

On March 20, 2002, Overheim sent Plaintiff a written memorandum to update her on her performance and to memorialize their February 15, 2002 meeting. (Overheim Aff., Ex. 4.) Overheim stated that Plaintiff had made improvements and that she was "for the most part proficient performing various administrative functions." He listed several examples of problems including: the errors referenced in the January 11, 2002, January 14, 2002, and February 8, 2002 emails; cash still unapplied from before September 11, 2001;[4] Plaintiff's abilities with Microsoft Excel and Word as seen from omissions and

---

4. After the September 11, 2001 attacks in New York, several Marsh offices took over from Marsh's New York office some assignments that would not otherwise have been their responsibility. Some of those extra assignments went to Plaintiff. (McNeail–Tunstall Dep. at 84–85.)

errors in her files; and Plaintiff's approval of a tuition reimbursement that did not comply with Marsh policies. Overheim informed Plaintiff that she was being put on probation because of her lack of significant progress in three critical areas of her job: technical expertise, relationship building, and effective communication. He also warned her that failure to make significant improvement would result in further disciplinary action, which could include termination. (*Id.*)

On March 22, 2002, Plaintiff sent an email to some clients asking for feedback on her team members. (Mem in Opp'n, Ex. N.) Plaintiff received several responses, indicating that clients were generally satisfied with members of her team, particularly with Chris Bodry and Kandy Wallace. (Mem in Opp'n, Ex. M–Q.)

After Plaintiff underwent surgery on March 25, 2002, she took a short-term disability leave from March 25, 2002 to April 9, 2002. (McNeail–Tunstall Aff. ¶ 23.) After Plaintiff returned to work, she became ill again and took another short-term disability leave until May 13, 2002. (*Id.* ¶ 24.)

Overheim and Higgins prepared a memorandum dated March 25, 2002 entitled "Final Performance Warning." (Overheim Aff., Ex. 5.) Overheim warned Plaintiff that any further issues with her performance would result in her termination. Overheim described an incident in March 2002 in which Plaintiff had used old "vendor codes" even though a new policy was distributed directing employees to use "payto codes" instead. Overheim claimed that this error indicated Plaintiff's failure to follow established procedures, her lack of appropriate review and oversight of her team, her technical deficiencies, and her preference not to perform basic inquiries or research tasks. (*Id.*) Overheim and Higgins presented this memo to Plaintiff on April 9, 2002, when she returned from disability leave. (Overheim Aff. ¶ 18.) Plaintiff refused to sign this memorandum. (McNeail–Tunstall Dep. at 91.) As of that date, neither Overheim nor Ms. Fields had informed Higgins of Plaintiff's first EEOC charge. (Overheim Aff. ¶ 19.)

On May 13, 2002, Dana Krebs, an internal client, sent an email to Higgins and Overheim requesting that Judy Floyd be assigned responsibilities that had been Plaintiff's, because Plaintiff did not provide adequate follow-up and constantly misapplied funds. (Overheim Aff., Ex. 6.)

While Plaintiff was out on her disability leaves, Higgins discovered other issues regarding Plaintiff's performance deficiencies. (Higgins Aff. ¶ 25.) Defendants then concluded that Plaintiff had not shown any improvement in any of the areas that they had been discussing with her, so they decided to terminate her. (Overheim Aff. ¶ 22; Fields Aff. ¶ 13; Higgins Aff. ¶ 26.) On June 19, 2002, Ms. Fields, Higgins, and Overheim met with Plaintiff to inform her that her employment with Marsh was terminated. (Overheim Aff. ¶ 23.) Marsh filled Plaintiff's former position with Kathy Davis, an African–American woman who was already employed by Marsh. (McNeail–Tunstall Dep. at 196.)

On June 25, 2002, Plaintiff filed a second EEOC charge, alleging unlawful retaliation. (Fields Aff., Ex. 2.)

On and around the spring of 2002, Plaintiff developed several mental and physical problems, including mitral valve prolapse, anxiety disorder, situational depression, and fatigue, as diagnosed by her physician. (Mem. in Opp'n, Ex. 15.) She entered individual psychotherapy. (*Id.*)

Plaintiff never discussed with Overheim the performance of any other Marsh employee. (McNeail–Tunstall Dep. at 153.) She does not know of any employees who were written up for performance problems

in the way she was or who were talked to by Overheim about their performances. (*Id.* at 153–54.)

## II. Procedural Background

Plaintiff filed this complaint pro se on October 18, 2002 alleging (1) violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e et seq. (2004), based on disparate treatment, hostile work environment, and unlawful retaliation; (2) violations of the Tennessee Human Rights Act ("THRA"), Tenn.Code Ann. § 4–21–401 et seq. (2004); (3) intentional infliction of emotional distress; and (4) negligent infliction of emotional distress.

Defendants filed the instant motion for summary judgment on December 12, 2003. Defendants argue that (1) Plaintiff cannot prove disparate treatment, hostile work environment, or retaliation under Title VII or the THRA; (2) Plaintiff has no cause of action against the individual defendants under Title VII or the THRA; (3) Plaintiff cannot prove the outrageous conduct necessary to support her intentional infliction of emotional distress claim; and (4) Plaintiff can present no facts to support her negligent infliction of emotional distress claim.

Plaintiff responded on January 12, 2004, arguing that (1) she has proffered evidence showing that her termination was based on race, because her white peers were treated differently than she was; (2) the evidence shows violations of Title VII and the THRA; (3) she does have a cause of action against the individual defendants under Title VII and the THRA because the facts fit within an exception allowing individual liability; and (4) the physical and mental effects that she suffered demonstrate that Defendants committed the tort of negligent infliction of emotional distress.

Defendants replied on February 2, 2004, reasserting their position and arguing that

(1) Plaintiff has not offered any evidence of the type that could defeat Defendants' motion for summary judgment; (2) Plaintiff misrepresents Defendants' legal arguments and the evidence; and (3) Plaintiff is unable to prove her claims.

## III. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In other words, summary judgment is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment may satisfy its initial burden of proving the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. This in turn may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the opponent's evidence to show why it does not support a judgment for the nonmoving party. 10a Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2727, at 35 (2d ed. Supp.1996).

Facts must be presented to the court for evaluation. *Kalamazoo River Study Group v. Rockwell Int'l,* 171 F.3d 1065, 1068 (6th Cir.1999). The court may consider any material that would be admissible at trial. 10a Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Prac-*

*tice and Procedure* § 2721, at 40 (2d ed.1983). Although hearsay evidence may not be considered on a motion for summary judgment, *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999), evidentiary materials presented to avoid summary judgment otherwise need not be in a form that would be admissible at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Thaddeus–X v. Blatter*, 175 F.3d 378, 400 (6th Cir.1999).

In evaluating a motion for summary judgment, all the evidence and facts must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Walborn v. Erie County Care Facility*, 150 F.3d 584, 588 (6th Cir.1998). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. *Kalamazoo River*, 171 F.3d at 1068.

Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

## IV. Title VII Claims

### 1. Individual Liability

■ The Sixth Circuit holds that Title VII does not permit individual liability on supervisory employees: "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir.1997). Defendants Overheim and Higgins clearly are not employers for Title VII purposes. The Court accordingly grants Defendants' motion for summary judgment on Plaintiff's Title VII claims as to Defendants Overheim and Higgins.

### 2. Title VII Disparate Treatment Claim

#### A. Legal Standard

■ Plaintiff offered no direct evidence of unlawful discriminatory intent, and therefore the order and allocation of burdens of proof are as established by the evidentiary framework set forth by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under the *McDonnell Douglas* burden shifting framework, the plaintiff must first prove a prima facie case of discrimination, thereby creating a rebuttable presumption of discrimination. *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003). To do so, the plaintiff must prove that the plaintiff (1) is a member of a protected group, (2) was subject to an adverse employment action (3) was qualified for the position, and (4) was replaced by a person outside the protected class or treated differently from similarly situated members of the unprotected class. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728–29 (6th Cir.1999); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). To be considered similarly situated, "the plaintiff need not demonstrate an ex-

act correlation with the employee receiving more favorable treatment ... rather ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)) (emphasis in original); *see also Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir.2000).

If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged adverse employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. The employer's burden is merely one of production, not of persuasion. *Anthony*, 339 F.3d at 515.

Once the employer provides a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff, who may still prevail by offering evidence that tends to disprove the reasons offered by the defendant. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 347 (6th Cir.1997). A plaintiff demonstrates pretext by showing that the defendant's proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000). Even if the plaintiff proves that the employer's proffered reason is pretext, the plaintiff still bears the ultimate burden of proving that discriminatory intent motivated the defendant's actions. *St. Mary's Honor Ctr. v.*

*Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

**B. Analysis**

█ Plaintiff clearly meets the first three elements of the prima facie case: she is African–American and so a member of a protected class, she was terminated from her job, and Defendants do not directly dispute that she was qualified for her position.[5] As to the fourth element, because Plaintiff was replaced by another African–American woman, to meet her burden, Plaintiff must show that similarly situated employees who were not African–Americans were treated differently than was she.

█ The Court finds at least two instances in which Plaintiff presented evidence showing a genuine issue of material fact as to whether Marsh treated similarly situated white employees differently. First, Plaintiff offered the example of Greta Spencer, a white female. Ms. Spencer was a team leader in the Treasury department, which was one of the Finance Center groups other than the Premium Accounting Department. Ms. Spencer reported directly to Overheim. Although Plaintiff has not proffered documents specifying every mistake made by Ms. Spencer, Marsh admits that Ms. Spencer had performance issues like Plaintiff's. Ms. Spencer, however, was not terminated for those performance issues until November 16, 2003, more than one year after Plaintiff's termination. (Overheim Aff. ¶ 25; Overheim Supplemental Aff. ¶ 4–5.) Based on that difference, the Court finds that Plaintiff has shown a genuine issue of fact as to

---

5. Defendants, of course, aver that they fired Plaintiff because of her performance deficiencies, which could be interpreted as an argument on the qualification prong of the prima facie case. Defendants, however, do not phrase their argument as such, instead assert-

ing Plaintiff's performance problems as their legitimate, nondiscriminatory reason for her termination. Plaintiff at least presented evidence that she was qualified at this prima facie case stage.

whether Marsh treated similarly situated employees outside of the protected class differently.

Defendants contest that Ms. Spencer is not an adequate comparator to Plaintiff because their job responsibilities were different in their respective departments. Even though the exact details of their jobs may have been different, the Court finds that Ms. Spencer's leadership position and the fact that she ultimately reported to the same supervisor as did Plaintiff render her similarly situated to Plaintiff in the relevant respects.

■ Second, Plaintiff offered the example of Jane Stuart, a white female. Ms. Stuart was also a team leader, and, according to Defendants, Marsh held her to the same standards as it did Plaintiff. (Higgins Aff. ¶ 28.) Like Plaintiff, Ms. Stuart had unapplied items from before September 11, 2001. Ms. Stuart's unapplied items existed as late as June 17, 2002, just two days before Plaintiff was terminated. Ms. Stuart did not receive any discipline for having those items unapplied. (Higgins Supplemental Aff. ¶ 8; Defs.' Am. Resps. to Pl.'s Req. for Admis. to Defs., Marsh, USA, Fred Higgins & Mark Overheim ¶ 11.) Defendants contend that Plaintiff and Ms. Stuart were not treated similarly because Ms. Stuart was active in trying to resolve her unapplied items, while Plaintiff gave up on the problem, which later proved easy to resolve. Also, Defendants aver that Ms. Stuart's performance was significantly better than was Plaintiff's overall. Such ambiguous distinctions, however, raise a fact question appropriate for the jury. Defendants also argue that Ms. Stuart's and Plaintiff's mistakes are distinguishable because they involve unapplied cash in the Agency Bill and Direct Bill departments, respectively. The Court is unable to see that any departmental difference actually distinguishes these two mistakes in any relevant manner. Given that both Plaintiff and Ms. Stuart were team leaders in the Finance Center and that they had at least one identical unresolved issue, the Court finds them to be similarly situated for purposes of the prima facie case. Plaintiff has shown a genuine issue of material fact to exist as to whether Marsh treated her differently than Ms. Stuart.

■ Plaintiff makes many other contentions, including that other employees made mistakes similar to hers for which they were not disciplined and that she was held responsible for her team members' mistakes, when other team leaders were not held responsible for their team members' mistakes. Plaintiff has not offered any evidence to support those allegations, particularly her allegations that any team leaders other than Ms. Spencer and Ms. Stuart made mistakes at all. For example, Plaintiff refers to a March 25, 2002 email from David McDivid discussing errors by Mary Champion, a member of Judy Floyd's team, resulting in misapplied funds in the Accounts Receivables department, but Plaintiff produced neither that email nor any evidence showing that Ms. Champion and Ms. Floyd did not receive discipline for any such errors. Also, Plaintiff contends that Dana Krebs, the BIC Coordinator, made mistakes for which she did not receive discipline; Plaintiff has offered only Marsh's admission that Ms. Krebs (not even named personally, but merely named as the BIC Coordinator) made some mistakes, but there is no admission or evidence that she was not similarly disciplined or that her mistakes were comparable to Plaintiff's. Furthermore, Plaintiff admitted in deposition testimony that she had not discussed with Overheim the performance of any of her co-workers and that she would not necessarily see any disciplinary write-ups of any other employees. (McNeail–Tunstall Dep. at 153–54,

207.) Plaintiff's unsupported speculation that other employees made mistakes on the same scale as her mistakes, without receiving similar discipline, is simply insufficient on a motion for summary judgment. Even though she proceeds pro se, Plaintiff may not rely solely on the substance of her pleadings, or the opinions stated therein, but she must support her pleadings with evidence. Other than as documented above with regard to Ms. Spencer and Ms. Stuart, Plaintiff has not done so.

■ Plaintiff has shown a genuine issue of material fact to exist as to whether similarly situated white employees were treated differently than she was, thereby completing her prima facie case for purposes of this summary judgment motion. The burden thus shifts to Defendant Marsh to articulate a legitimate, nondiscriminatory reason for its termination of Plaintiff's employment. Marsh met this burden of production by stating that it terminated Plaintiff because "for more than a year Plaintiff had numerous performance issues that were not resolved despite training, counseling and even a final warning notice ... the sole reason for Plaintiff's termination was her performance deficiencies." (Mem. in Supp. of Defs. Marsh USA, Fred Higgins & Mark Overheim's Mot. for Summ. J. at 11–12.) Marsh offered significant evidence supporting the contention that Plaintiff made numerous mistakes and had performance problems and that Higgins and Overheim gave her several warnings, both written and oral, before proceeding to her termination.

Accordingly, the burden shifts back to Plaintiff to show pretext. Plaintiff does not deny that she made many mistakes; in fact, she seems generally to agree that Marsh fired her because of her performance problems. (McNeail–Tunstall Dep. at 153 ("... the end result is that I was terminated for my performance.")) Plain-

tiff's contention as to pretext appears to be that Defendants' reasons for terminating her were insufficient, given that other employees were not fired for similar mistakes, or that many of Defendants' contentions regarding their treatment of her were untrue.

For example, Plaintiff contends that Higgins's and Overheim's so-called "counseling" of her through emails and meetings was not actually counseling, but was just day to day conversation between the parties. The difference between those two activities may simply be semantics, as Defendants point out. Plaintiff, however, has at least offered evidence showing that many emails that Defendants described as counseling of Plaintiff were actually discussions about her that were not shown to her before litigation. This indicates that they could not have been helpful to her during her employment, as counseling is generally meant to be. Further, Plaintiff offered evidence showing that Higgins and Overheim delayed telling her of her performance difficulties until June 2001, after the February 2001 date that they now assert their counseling to have begun. Finally, Plaintiff has shown that several mistakes attributed to Plaintiff were actually the fault of Plaintiff's team members or another team with which her team worked. This evidence does not explicitly contradict Defendants' assertions that Higgins and Overheim attempted to work with Plaintiff to improve her performance, or that Plaintiff's performance was ultimately deficient, but it does show falsities in Defendants' arguments and inconsistencies in Defendants' actions. This raises the genuine issue of material fact as to pretext that Plaintiff needs to survive summary judgment.

■ Plaintiff also counters Defendants' assertion that Higgins and Overheim received complaints from other offices re-

garding Plaintiff's performance by stating that the other offices were satisfied with her performance. Plaintiff offered emails as evidence that at least some of the other offices were satisfied with the performance of Plaintiff's team members. While that is not entirely equivalent to complimenting Plaintiff's own performance, the Court finds convincing Plaintiff's argument that if she is to be held responsible for her team member's deficiencies, she should also be rewarded for their successes. Although Plaintiff does not raise this issue herself, the Court notes that much of the evidence offered by Defendants to show that people complained about Plaintiff's performance is hearsay and therefore not available for the Court to consider on a summary judgment motion. *See Jacklyn,* 176 F.3d at 927. This includes the emails between Higgins, Overheim, and Ms. Fields noting statements made by other employees as to the adequacy of Plaintiff's performance. The Court therefore finds that Plaintiff has shown a genuine issue of material fact as to the veracity of Defendants' assertions that other offices complained about Plaintiff's performance.

As to Defendants' differing treatment of other employees, the evidence remains the same as that offered to support Plaintiff's prima facie case: the only evidence that she has so far been able to adduce regards Ms. Spencer and Ms. Stuart. Such evidence, however, may support Plaintiff's pretext argument by showing that Defendant's proffered reason for her termination was insufficient. *See Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 471–72 (6th Cir. 2002) (describing permissible pretext arguments based on evidence that other employees, particularly those not in plaintiff's protected class, were not fired even though they engaged in substantially identical conduct as that which defendant claims to have motivated it to fire plaintiff).

At trial, the ultimate burden of persuasion rests with Plaintiff, and it will be for the jury to determine whether she can prove that her termination was motivated by discrimination. Given the documented evidence of Plaintiff's ongoing performance difficulties, the Court opines that such proof may be difficult for Plaintiff to present. At this stage of the litigation, however, Plaintiff has shown a genuine issue of material fact as to the facts of her prima facie case and pretext so as to survive summary judgment. Defendants' motion is denied as to Plaintiff's claim of disparate treatment under Title VII as to Defendant Marsh.

### 3. Title VII Hostile Work Environment Claim

#### A. Legal Standard

▮ To establish a racial harassment hostile work environment claim, a Title VII plaintiff must prove the following prima facie case: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment affected a term, condition, or privilege of employment or unreasonably interfered with the employee's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1078–79 (6th Cir.1999); *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999). To be unlawful, hostile environment harassment must be "sufficiently severe or pervasive" to alter a term, condition, or privilege of the claimant's employment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Also, the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or

abusive, and the victim must subjectively regard the environment as such. *Id.* at 21–22, 114 S.Ct. 367.

■■■■ A court must consider the totality of the circumstances in determining whether, objectively, the alleged harassment constitutes a hostile work environment. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir.1999); *Campbell v. Fla. Steel Corp.,* 919 S.W.2d 26, 32 (Tenn. 1996). Appropriate factors to consider include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. Conduct must be "extreme" to amount to a change in the terms or conditions of employment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Isolated incidents alone must be extremely serious to allow liability. *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir.2000).

## B. Analysis

Plaintiff describes five items that she felt constituted racial harassment: (1) the February 8, 2002 email from Overheim calling her "lack of resourcefulness ... astonishing;" (2) the February 15, 2002 conversation between her, Overheim, and Higgins, in which Overheim asked her how she felt about her performance and whether she felt she was performing at the same level as her peers; (3) the offer of a lower-level position in the Atlanta office; (4) the various emails from Overheim and Higgins detailing her mistakes, errors, or alleged performance deficiencies; and (5) various meetings in which she was told that she was an embarrassment and unfit for her job. The Court finds these instances insufficient to make a prima facie case of

racial hostile work environment harassment.

■■■■ First, the Court finds nothing in the February 8, 2002 email to demonstrate harassment because of Plaintiff's race. Overheim's email stated:

Your lack of resourcefulness on this one is astonishing. Who have you asked on this? Have you tried the internet or perhaps directory information? What is going on with all of the Marsh items? I see where you sent an e-mail today .... you earlier mentioned that you had contacted the other FC's. What's the result? How about the Travelers item .... what have we done to clear it?

(Overheim Aff., Ex. 1.) While Overheim's choice of language may not have been exemplary (and indeed caused Ms. Fields to speak to him about appropriate language and led him to apologize to Plaintiff), nothing shows the email to have been race-based. Thus, the Court may not consider it in the racial harassment calculus. *See Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir.2000) (excluding from the harassment analysis allegedly harassing acts that plaintiff did not show were based on his status as a male).

■■■■ Second, the other alleged incidents of harassment through meetings and emails are not on their face race-based. If Plaintiff can prove that similarly situated white employees did not face the same treatment, she may be able to show that the alleged harassment would not have occurred but for her race. *See Jackson v. Quanex Corp.,* 191 F.3d 647, 662 (6th Cir. 1999) ("[E]ven though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American."). As stated above, Plaintiff was only able to create a genuine issue of material fact as to dif-

fering treatment of similarly situated white employees in two cases, and neither of those cases relates precisely to the incidents described here.

Assuming arguendo that similarly situated white employees were not subject to the same sorts of emails or conversations that Plaintiff alleges constitute harassment, the Court finds that Plaintiff failed to create a genuine issue of material fact as to whether these incidents were objectively hostile and abusive so as to alter the terms, conditions, or privileges of Plaintiff's employment. While Plaintiff may not have appreciated the ongoing discussion of her work performance, the evidence shows, and Plaintiff admits, that she made continual errors that merited some response from her supervisors. Upon examination of the various emails, meetings, and memoranda, the Court finds nothing in them to be objectively abusive or hostile. Rather, they represent a continual documenting of errors admittedly made by Plaintiff, discussions of how to improve her performance, and attempts to point out to her where she went wrong. Similarly, Defendants' offer of a demotion to the Atlanta office, while undesirable from Plaintiff's perspective, appears to be a further attempt to resolve the situation, rather than abusive behavior. While some of Overheim's and Higgins's language could perhaps have been more delicate, insulting language alone is not enough to alter the terms, conditions, or privileges of employment. Plaintiff offers no evidence of any meetings in which she was called an "embarrassment." There is no contention that Plaintiff suffered any physical harassment or harm.

The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's Title VII hostile work environment claim.

### 4. Title VII Retaliation Claim

#### A. Legal Standard

 Section 704(a), Title VII's retaliation provision, states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 (6th Cir. 2000) (denying summary judgment on claim of retaliation for plaintiff's advocacy against discrimination by defendant). In the Sixth Circuit, a plaintiff makes out a prima facie case of unlawful retaliation by proving that (1) she engaged in activity protected by Title VII; (2) her exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Id.* at 578. A causal connection is shown when the plaintiff produces sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in protected activity. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000) (affirming district court's holding that plaintiff produced no evidence to support an inference that defendant's refusal to promote him was in

retaliation for EEOC charges that he filed against defendant). A causal connection can be shown through direct evidence or through knowledge on the part of the defendant plus a closeness in time that creates an inference of causation. *See Johnson,* 215 F.3d at 582–83.

Once the plaintiff proves the prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Johnson,* 215 F.3d at 578. To succeed, the plaintiff must then demonstrate that the defendant's articulated reason was not the true reason for the adverse employment action but was instead a pretext for discrimination. *Id.* at 578–79.

### B. Analysis

■ First, Plaintiff engaged in activity protected by Title VII when she complained of a hostile work environment to Ms. Fields, Marsh's Human Resources Manager, on February 9, 2002, and when she filed her March 14, 2002 charge with the EEOC.[6] Second, both instances of protected activity were known to Marsh.

■ Third, Plaintiff suffered adverse employment actions at least when she was terminated and when Higgins and Overheim gave her the final warning memorandum on March 25, 2002. It is arguable whether other discipline or reprimands received by Plaintiff between her first complaint and her termination qualify as adverse employment actions. *Compare Handshoe v. Mercy Med. Ctr.,* 34 Fed.Appx. 441, 447 (6th Cir.2002) (noting that other circuits have considered reprimands to be adverse employment actions

when they were part of an overall pattern of retaliation, often culminating in a tangible adverse action), *with Jones v. Butler Metro. Hous. Auth.,* 40 Fed.Appx. 131, 137 (6th Cir.2002) (stating that, unless a reprimand is accompanied by some other action, such as a demotion or salary reduction, it is not an adverse employment action). *Cf. Jones,* 40 Fed.Appx. at 136 (listing as examples of adverse employment actions (1) termination of employment, (2) demotion resulting in loss of benefits or salary reduction, (3) conferring of a less distinguished title, (4) material loss of benefits, (5) significantly diminished material responsibilities, or (6) other factors unique to the plaintiff's situation). Given the continuing pattern of reprimands and disciplinary action and the ultimate conclusion with Plaintiff's termination, the Court finds that Plaintiff suffered adverse employment actions through general discipline in addition to the final warning and the termination.[7]

■ The causal connection prong is therefore the decisive issue. Plaintiff offers no direct evidence of causation. She offers circumstantial evidence from which the Court can infer causation only in that she has shown knowledge by Marsh (through Ms. Fields, its agent) and temporal proximity between both instances of protected activity and the overall pattern of disciplinary action. Although the termination occurred three months after the last instance of protected activity, the Court finds that the ongoing nature of the discipline allows an inference of causation as to the termination. Plaintiff offers no other circumstantial evidence from which the

---

6. Plaintiff's second EEOC charge was filed on June 25, 2002, after her termination from Marsh, and therefore it is irrelevant to her retaliation claim.

7. The Court therefore need not address whether Plaintiff was subjected to severe or

pervasive retaliatory harassment by her supervisors but notes that, having failed to raise a genuine issue of material fact on her hostile work environment claim, Plaintiff would likely be unable to show sufficient harassment for this prong of a retaliation prima facie case.

Court could infer causation, as the evidence essentially shows a long string of disciplinary incidents, occurring both before and after Plaintiff's protected activity and escalating steadily over the course of a year until concluding with the termination. The Court, however, finds that Plaintiff has shown a genuine issue of material fact on her prima facie case of unlawful retaliation as to Defendant Marsh, based on circumstantial evidence through knowledge and temporal proximity.

Marsh met its burden of production by articulating a legitimate, nondiscriminatory reason for its discipline and termination of Plaintiff. Specifically, Defendants point to Plaintiff's ongoing performance deficiencies, which Overheim, Higgins, and Ms. Fields discussed with her for over one year. Higgins and Overheim also presented their reasons to Plaintiff at the time of the discipline, as in the final warning memorandum, in which Overheim states "This incident continues the pattern of your [ ] failure to follow established procedures and your lack of appropriate review and oversight of your team. This also highlights your substantial technical deficiencies or your preference not to perform basic inquiry or research tasks." (Overheim Aff., Ex. 5.)

The burden thus shifts back to Plaintiff to show pretext as to Defendant's articulated reason. For the reasons stated above in Section IV.2.B, the Court finds that Plaintiff has met her burden as to pretext. Plaintiff may attempt to prove unlawful retaliation at trial. The Court therefore denies Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claim as to Defendant Marsh.

## V. Tennessee Human Rights Act

### 1. Individual Liability

In line with Title VII analysis, the Tennessee courts hold that the THRA generally does not impose individual liability on supervisors or co-workers. *Carr v. United Parcel Serv.,* 955 S.W.2d 832, 835 (Tenn.1997) (hostile work environment), *overruled on other grounds, Parker v. Warren County Util. Dist.,* 2 S.W.3d 170 (Tenn.1999). The THRA is broader than Title VII, however, in that it permits liability of individual defendants for aiding, abetting, inciting, compelling, or commanding an employer to engage in any discriminatory acts or practices. *See* Tenn.Code Ann. § 4-21-301(2); *Carr,* 955 S.W.2d at 835-36. The THRA does not define "aiding and abetting," so the Tennessee Supreme Court refers to the analogous theory under the common law, requiring that the individual defendant know that the employer's conduct constituted a breach of duty and give substantial assistance or encouragement to the employer in its discriminatory acts. *Carr,* 955 S.W.2d at 836. Liability requires affirmative conduct by the individual defendant; a failure to act or mere presence during the employer's discrimination is insufficient. *Id.* Liability, however, is not imposed based on the individual defendant's own discriminatory acts; it requires distinct conduct that aids or abets discrimination by the employer, as when, for example, the individual defendant prevents the employer from taking corrective action. *Id.* at 836, 838. *See also Crutchfield v. Aerospace Ctr. Support,* 202 F.3d 267, 1999 WL 1252899, at *2 (6th Cir. Dec.14, 1999) (affirming district court's grant of summary judgment in favor of individual defendant on THRA claim when defendant's actions adverse to plaintiff's employment were all within the legitimate scope of defendant's delegated management authority).

Plaintiff argues that THRA accomplice liability may be imposed on Defendants Higgins and Overheim because, she alleges, they acted affirmatively to influence Ms. Fields, an agent of Marsh, to

believe that Plaintiff was a poor performer and a liability to Marsh, ultimately encouraging Marsh to terminate Plaintiff's employment. Plaintiff also argues. for individual liability based on the lack of investigation into Plaintiff's February 9, 2002 complaint to Ms. Fields, seemingly arguing that the lack of investigation came as a result of Ms. Fields's conversation with Overheim about Plaintiff's complaint. Defendants admit that, following Plaintiff's February 9, 2002 complaint, Ms. Fields investigated Plaintiff's allegations by talking with Overheim, and that no disciplinary or other reports nor any follow-up investigation occurred. (Def. Marsh USA's Supplemental Resps. to Pl.'s First Set of Interrogs. to Defs. Marsh USA, Fred Higgins & Mark Overheim, Interrog. 7.)

Plaintiff offers no evidence supporting her claim for aiding and abetting liability. All actions allegedly taken by Defendants Overheim and Higgins occurred within the legitimate scope of their supervisory authority, as they involved steps taken to address a subordinate employee's performance deficiencies and errors. This includes their discussions with Ms. Fields, who, being the human resources manager, was the appropriate Marsh employee for discussions about employment problems. In this capacity, Overheim and Higgins acted as agents of Marsh, thus precluding individual liability under the THRA. *Carr*, 955 S.W.2d at 835. Plaintiff did not produce any evidence that Overheim or Higgins prevented or impeded Marsh's investigation through Ms. Fields. Any discriminatory conduct undertaken by Overheim and Higgins themselves, which Plaintiff alleges, does not allow the imposition of individual THRA liability, as their own discriminatory conduct exists separate and apart from any aiding or abetting of discrimination by Marsh. The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's THRA claims against Defendants Overheim and Higgins.

## 2. Employer Liability

Courts generally analyze THRA claims using the legal principles developed for analysis of the analogous federal civil rights statutes. *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.*, 173 F.3d 988, 993 (6th Cir.1999) (race discrimination under Title VII and THRA); *Campbell*, 919 S.W.2d at 31 (hostile work environment under Title VII and THRA). Accordingly, the Court follows its above rulings regarding Plaintiff's Title VII claims, granting Defendants' motion for summary judgment of Plaintiff's hostile work environment claim under the THRA and denying Defendants' motion for summary judgment of Plaintiff's disparate treatment and retaliation claims under the THRA as to Defendant Marsh.

## VI. Intentional Infliction of Emotional Distress

To prove intentional infliction of emotional distress in Tennessee, a plaintiff must show that (1) the conduct complained of was reckless or intentional, (2) it was so outrageous that it would not be tolerated in a civilized society, and (3) it resulted in serious mental injury to the plaintiff. *Richardson v. CVS Corp.*, 207 F.Supp.2d 733, 746 (E.D.Tenn.2001). It is the plaintiff's burden to prove outrageousness, which requires the plaintiff to show that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* (finding that plaintiff did not show outrageous conduct when plaintiff's allegation that defendants violated federal law was only basis for intentional infliction

of emotional distress claim and plaintiff did not provide evidence of serious mental injury). This is an extremely high standard for the plaintiff to meet. *See, e.g., Pollard v. E.I. DuPont de Nemours Co.,* 213 F.3d 933, 947 (6th Cir.2000) (finding fact issue on outrageousness when plaintiff suffered consistent harassment over several years, her work was sabotaged, she was subjected to juvenile pranks, her personal safety was compromised, she was forced to resign from her shift, and she was constantly told that women were inferior), *rev'd on other grounds,* 532 U.S. 843, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001); *Jones v. Tenn. Valley Auth.,* 948 F.2d 258, 266 (6th Cir.1991) (finding evidence insufficient to show outrageousness when supervisors intimidated plaintiff by assigning him to menial tasks, unfairly reprimanded him, gave him low performance appraisals, monitored his communications with government agencies, attempted to gain access to his medical records, and barred him from promotions, bonuses, and raises); *Evans v. Detlefsen,* 857 F.2d 330, 337 (6th Cir.1988) (finding evidence sufficient to support outrageousness element when plaintiff suffered personal vindictiveness, threats, intimidation, and verbal and physical abuse from a police officer after a minor traffic offense).

Plaintiff clearly does not meet her burden to demonstrate outrageousness. In her response brief, Plaintiff mentions only her negligent infliction of emotional distress claim, discussing the mental distress she suffered. Therefore, the only evidence she presents regarding outrageousness is the same as her allegations that Defendants violated federal anti-discrimination laws. As in *Richardson,* alleging a violation of federal law, without additional evidence showing conduct so outrageous as not to be tolerated in civilized society, is simply insufficient to prove intentional infliction of emotional distress. The evidence shows many emails, some with abrupt language, several disciplinary meetings, and three memoranda documenting Plaintiff's errors and performance deficiencies. This behavior simply does not merit the description "outrageous."

Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim.

## VII. Negligent Infliction of Emotional Distress

In *Camper v. Minor,* 915 S.W.2d 437 (Tenn.1996), the Tennessee Supreme Court addressed the elements necessary to prove negligent infliction of emotional distress. Abandoning previous Tennessee law for this tort, the Court held that, for a plaintiff to survive summary judgment on a negligent infliction of emotional distress claim, the plaintiff must present material evidence as to the five elements of a general negligence claim: duty on the part of the defendant, breach of that duty, injury or loss to the plaintiff, causation in fact, and proximate cause. *See id.* at 446. The plaintiff's injury must be serious or severe emotional injury, which occurs when " 'a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.' " *Id.* (quoting *Rodrigues v. State,* 52 Haw. 156, 472 P.2d 509, 520 (1970)). Also, the plaintiff must support the claimed injury or impairment with expert medical or scientific proof. *Id.* The plaintiff need not show a physical manifestation or injury. *Id.*

The Court finds that Plaintiff has presented sufficient evidence to survive summary judgment on her negligent infliction of emotional distress claim. Defendants had a duty not to cause Plaintiff to suffer emotional distress, and Plaintiff presented sufficient evidence to show a genuine issue of fact as to Defendants' breach

of that duty. The medical reports document that she suffered serious emotional injuries, including an anxiety disorder and situational depression severe enough to cause her to attend individual psychotherapy. Her therapist's notes document the connection between her feelings of emotional distress and her employment. While Plaintiff will need an expert witness to prevail at trial, given that Plaintiff proceeds pro se, the medical reports, therapist's notes, and secondary resources about situational depression present sufficient issues of fact on Plaintiff's negligent infliction of emotional distress claim for her to survive summary judgment.

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's negligent infliction of emotional distress claim.

## VIII. Conclusion

The Court finds that neither Title VII nor the THRA permits individual liability on the facts presented here. The Court also finds that Plaintiff did not show a genuine issue of material fact on her hostile work environment claim under Title VII or the THRA, because Defendants' conduct was not objectively so severe or pervasive as to alter the terms, conditions, or privileges of Plaintiff's employment. The Court also finds that Plaintiff did not meet her burden of showing conduct so outrageous as to support a intentional infliction of emotional distress claim. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on (1) all of Plaintiff's Title VII and THRA claims against Defendants Overheim and Higgins, (2) Plaintiff's hostile work environment claim under Title VII and the THRA against Defendant Marsh, and (3) Plaintiff's intentional infliction of emotional distress claim against all Defendants.

The Court finds that Plaintiff met her burden as to her disparate treatment and retaliation claims under Title VII and the THRA against Defendant Marsh, showing a genuine issue of material fact as to differing treatment of similarly situated white employees and as to pretext. The Court also finds that Plaintiff presented sufficient material evidence to avoid summary judgment on her negligent infliction of emotional distress claim. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on (1) Plaintiff's disparate treatment and retaliation claims under Title VII and the THRA against Defendant Marsh only, and (2) Plaintiff's negligent infliction of emotional distress claim against all Defendants.